# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

THERESA JAMES, as wrongful death estate
representative for Jay Murphy Sr., deceased, and as
custodial parent and next friend of her daughter, M.,
a minor,

       Plaintiff,

vs.                                 No. CIV 09-0540 JB/CG

MARTIN CHAVEZ, III, individually and in his
official capacity as Mayor of the City of
Albuquerque, RAY SCHULTZ, individually and in
his official capacity as Chief of Police of the City of
Albuquerque, RUSSELL CARTER, individually and
in his official capacity as an officer of the
Albuquerque Police Department "S.W.A.T." Team,
MICHAEL FOX, individually and in his official
capacity as an Officer (Detective) of the Albuquerque
Police Department, CITY OF ALBUQUERQUE, as
an Albuquerque Police Department, a municipal
entity organized under the laws of the State of New
Mexico and its law enforcement agency, JOSH
BROWN, an Officer of the Albuquerque Police
Department, individually.

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the City Defendants' Motion for Partial

Summary Judgment No. I: Dismissal of Plaintiff's Fourth and Fourteenth Amendment Excessive

Force Claims Against Officer Carter and Fourteenth Amendment Equal Protection Claim, filed

August 16, 2011 (Doc. 103)("MSJ").  The Court held a hearing on October 4, 2011.  The primary

issues are, with respect to the claims against Defendant Russell Carter, whether the Court should

enter summary judgment against Plaintiff Theresa James on her: (i) unlawful entry claims;

(ii) excessive force claims asserted under a Fourth Amendment theory (Count IV and V);

(iii) excessive force claims asserted under a substantive due-process theory (Count IV and V); and

(iv) Equal Protection Clause claims against Carter and the rest of the Defendants.  The Court will grant the Motion for Summary Judgment.  The Court will enter summary judgment on the excessive-force claims asserted under a Fourth Amendment theory as Carter did not seize either James Murphy Sr. or Mariah Murphy within the meaning of the Fourth Amendment.  Because James' unlawful entry claims are not in the Amended Complaint, and because James would have to move to amend to add these claims to the case, the Court will deny leave to amend.  Granting leave to amend on the unlawful entry claims would be futile.  Pursuant to the parties' agreement that the Court can address these unlawful entry claims, the Court will enter summary judgment on James' unlawful entry claims as exigent circumstances justified Carter's conduct in ordering the SWAT raid and his conduct was reasonable.  The Court will enter summary judgment on James' excessive force claims asserted under a substantive due-process theory because Carter's conduct does not shock the conscience.  The Court will enter summary judgment on James' Equal Protection Clause claims against Carter and the other Defendants as James has agreed to voluntary dismissal of those claims.

## FACTUAL BACKGROUND

While James disputes one of the Defendants' allegedly undisputed facts, almost all of the material facts are undisputed.  See Plaintiff's Response in Opposition to Defendants' First Motion for Summary Judgment (Doc. No. 103) at 2-3, filed September 12, 2011 (Doc. 123)("Response").  More specifically, James disputes only one of the Defendants' facts -- whether Murphy Sr. threatened his daughter.  See Response at 2-3.  Additionally, James asserts that some of the

Defendants' facts are not material.  See Response at 2-3.[1]  James also provides several additional material facts in her Response.  The Defendants do not specifically controvert these additional material facts in their Reply.  See Reply to Response to City Defendants' Motion for Partial Summary Judgment No. I: Dismissal of Plaintiffs' Fourth and Fourteenth Amendment Excessive Force Claims Against Officer Carter and Fourteenth Amendment Equal Protection Claim, filed September 19, 2011 (Doc. 135)("Reply").  The Court then assumes the additional facts in the Response to be true for the purposes of this Motion for Summary Judgment.  See D.N.M.LR-Civ. 56.1(b) ("The Reply must contain a concise statement of those facts set forth in the Response which the movant disputes or to which the movant asserts an objection. . . . All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

On June 5, 2007, at approximately 1:37 p.m., Arturo Bandera telephoned the Albuquerque Police Department ("APD") communications operator from his residence located at 1613 Spence, SE.  See Deposition of Arturo Bandera at 37:23-25 (taken July 28, 2011), filed August 16, 2011 (Doc. 103-1)("Bandera Depo.").  Bandera informed the APD operator that the decedent in this matter, Murphy Sr., was standing at Bandera's front door armed with a knife.  See Bandera Depo. at 38:3-7.  In addition, Bandera stated that the suspect's actions were causing him to fear for his safety and requested that APD respond quickly.  See Bandera Depo. at 38:9-12.  Immediately following Bandera's call to the APD communications operator, Murphy Sr. left the area in a green Dodge four-by-four pick-up truck with a government license plate.  See Albuquerque Police

---

[1]As the Tenth Circuit has recognized, the substantive law will identify which facts are material, and only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  See Hunter v. Young, 238 F.App'x 336, 338 (10th Cir. 2007)(unpublished)(quoting Cooperman v. David, 214 F.3d 1162, 1164 (10th Cir. 2000).  Thus, the Court will make the determination of what facts are material and which are not when it conducts its analysis of the applicable arguments.

Department Interview of Jay Murphy Jr. at 7:14-18 (dated June 5, 2007), filed August 16, 2011 (Doc. 103-2)("Murphy Jr. Interview"); Albuquerque Police Department Interview of Mariah Murphy at 7:7-12 (dated June 5, 2007), filed August 16, 2011 (Doc. 103-3)("M. Murphy Interview").

Upon receiving Bandera's call, APD dispatched APD Officer Leonard Holloway to respond to Bandera's call. See Albuquerque Police Department Supplemental Report of Officer Leonard Holloway at 1 (dated June 5, 2007), filed August 16, 2011 (Doc. 103-4)("Holloway Supplemental Report"). Upon his arrival in the area, Holloway observed an individual matching the description of the suspect traveling southbound on University Blvd. SE, near Gibson Blvd. SE, in a green Dodge pick-up truck. See Holloway Supplemental Report at 1. Furthermore, Holloway observed the driver of the green Dodge pick-up truck waving a knife while traveling southbound on University near Gibson. See Holloway Supplemental Report at 1. While in motion, Holloway observed the driver of the vehicle throw a full bottle of beer out the vehicle's window. See Holloway Supplemental Report at 1. Ultimately, the driver turned the vehicle westbound on Spence SE and parked in the driveway of 1608 Spence SE. See M. Murphy Interview at 7:11-12. The driver of the vehicle, later identified as Murphy Sr., exited the truck and proceeded towards the front door of 1608 Spence SE, where Holloway observed Murphy Sr. holding a knife. See Murphy Jr. Interview at 8:13-20; M. Murphy Interview at 7:1-14. Murphy Sr. yelled at Officer Holloway and ran into his residence. See Holloway Supplemental Report at 1. Additional APD officers began to arrive on the scene, as Holloway had previously requested additional assistance. See Holloway Supplemental Report at 1.

Shortly thereafter, APD Crisis Intervention Team ("CIT") Officer Nicholas Sanders arrived at the scene to assist Officer Holloway. Holloway Supplemental Report at 1; Albuquerque

Supplemental Report of Officer Nicholas Sanders at 1 (dated June 5, 2007), filed August 16, 2011 (Doc. 103-5)("Sanders Supplemental Report").  Moments before Sanders' arrival, Murphy Sr.'s son, Jay Murphy Jr., exited 1608 Spence SE in an attempt to advise the police of Murphy Sr.'s emotional state.  See Murphy Jr. Interview at 7:20-8:4; Holloway Supplemental Report at 1; Sanders Supplemental Report at 1.  Because Murphy Jr. was a potential witness, and for Murphy Jr.'s own safety, Holloway placed Murphy Jr. in the rear seat of his patrol car.  See Holloway Supplemental Report at 1; Murphy Jr. Interview at 12:9-12.  Approximately ten minutes after Sanders arrived at the scene, Murphy Sr. stepped out of the residence holding a twelve- to fourteen-inch knife, a boom box radio, and a beer bottle.  See Sanders Supplemental Report at 1.  Murphy Sr. told the officers to release his son or someone would get hurt.  See Sanders Supplemental Report at 1.  While holding these items, Murphy Sr. approached Sanders.  See Sanders Supplemental Report at 1.  Instead of complying with Sanders' command, Murphy motioned as if he was going to throw the boom box radio or the beer bottle at Sanders.  See Sanders Supplemental Report at 1.

The third officer to arrive on scene, APD Officer George Trujillo, also witnessed Murphy Sr. in front of 1608 Spence SE holding a knife and yelling in an irate manner.  See Holloway Supplemental Report at 1; Sanders Supplemental Report at 1; Albuquerque Police Department Supplemental Report of Officer George Trujillo at 1 (dated June 5, 2007), filed August 16, 2011 (Doc. 103-6)("Trujillo Supplemental Report").  As Murphy Sr. moved toward Sanders, Murphy Sr. threw a full bottle of beer at Trujillo.  See Trujillo Supplemental Report at 1.  The beer bottle broke in front of Trujillo, striking him with broken glass and beer.  See Trujillo Supplemental Report at 1.  Murphy Sr. then threw the boom box radio at officers, but missed striking them.  See Trujillo Supplemental Report at 1.  Afterward, Murphy Sr. retreated behind a wrought iron front door at 1608 Spence SE, continuing to ignore commands by officers to drop the knife.  See Holloway

Supplemental Report at 1; Sanders Supplemental Report at 1; Trujillo Supplemental Report at 1.

After Murphy Sr. retreated into his residence, Sanders used his patrol vehicle's public address

("PA") system to instruct Murphy Sr. to exit his residence without any weapons and his hands in the

air.  See Holloway Supplemental Report at 1; Sanders Supplemental Report at 1.  In response,

Murphy Sr. yelled back in an aggressive manner, threatening the APD officers.  See Holloway

Supplemental Report at 1; Sanders Supplemental Report at 1.  While this verbal exchange took

place, Trujillo observed a teenage female,[2] M. Murphy, look out of the front window.  See M.

Murphy Interview at 12:2-5; Trujillo Supplemental Report at 1.[3]  After noticing M. Murphy in the

window, Sanders used the PA to direct Murphy Sr. to release M. Murphy, but Murphy Sr. refused.

See Sanders Supplemental Report at 1; Trujillo Supplemental Report at 1; Deposition of Mariah

Murphy at 79:16-20 (taken July 29, 2011), filed August 16, 2011 (Doc. 103-7)("M. Murphy

Depo.").

     While M. Murphy stood next to Murphy Sr. at the front door of the residence, Trujillo began

face-to-face negotiations with Murphy Sr.  See Trujillo Supplemental Report at 1.  Officer Trujillo

watched M. Murphy attempt to walk past Murphy Sr., who was standing at the front door.  See

Trujillo Supplemental Report at 1.  Murphy Sr. grabbed M. Murphy by her arm and pulled her back

---

[2]The parties do not specify M. Murphy's exact age in their statements of material facts.

[3]The parties do not note in their statements of material facts whether the officers knew M. Murphy was Murphy Sr.'s daughter.  It would seem that a father would be less likely to harm his daughter than some other teenager.  Given that the officers had interactions with Murphy Jr. and were communicating with Murphy Sr., it is a reasonable inference that the officers knew Murphy Sr. and M. Murphy's relationship.  In any case, the Court will resolve this reasonable inference in favor of James and assume that the officers knew M. Murphy was his daughter.  See Hunt v. Cromartie, 526 U.S. 541, 551 (1999)(stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party).

into the residence stating, "You're not going anywhere." <u>See</u> Trujillo Supplemental Report at 1.[4]

After arriving on scene and assessing the situation, APD Sergeant Terre Molander requested the

assistance of the APD Special Weapons and Tactics ("SWAT") team.  <u>See</u> Albuquerque Police

Department Supplemental Report of Sergeant Terre Molander at 1 (dated June 5, 2007), filed August

16, 2007 (Doc. 103-8)("Molander Supplemental Report").  At approximately 1:55 p.m., the APD

communication's supervisor instructed Acting SWAT Lieutenant Robert Johnston to call Molander

on his cell phone.  <u>See</u> Albuquerque Police Department Supplemental Report of Acting Lieutenant

Robert Johnston at 1 (dated June 5, 2007), filed August 16, 2007 (Doc. 103-9)("Johnston

Supplemental Report").  Johnston contacted Molander, who advised Johnston that the officers

needed SWAT assistance at 1608 Spence SE immediately.  <u>See</u> Johnston Supplemental Report at

1.  After speaking with Molander, Johnston contacted SWAT Sergeant Tim Gaunterman, who

subsequently paged the APD SWAT team and directed them to respond to the incident taking place

at 1608 Spence SE.  <u>See</u> Johnston Supplemental Report at 1.

  After Trujillo's verbal exchange with Murphy Sr. ended, Sanders took over the negotiations

and requested that Murphy Sr. release M. Murphy.  <u>See</u> M. Murphy Interview at 11:4-7; Sanders

---

[4]James denies that Murphy Sr. threatened or restrained his daughter from leaving, other than out of fear for her safety.  <u>See</u> Response at 3.  In the section of her Response where James controverts this fact, she does not present evidence specifically controverting this fact.  In her statement of additional material facts, however, she provides an affidavit from M. Murphy where M. Murphy states that her father never threatened her and never intended to harm her.  <u>See</u> Affidavit of Mariah Murphy ¶ 4, at 1, filed September 12, 2011 (Doc. 123-4)("M. Murphy Aff.").  Because the Court must construe all evidence in the light most favorable to the non-moving party, <u>see</u> <u>Hunt v. Cromartie</u>, 526 U.S. at 551, the Court will accept as true the assertion that Murphy Sr. did not threaten or intend to harm M. Murphy.  <u>See</u> M. Murphy Aff. ¶ 2-3, at 1 ("Before he was shot, my father never threatened me in any way while we were in the house together.").  This evidence is sufficient to specifically controvert any inference drawn from the Defendants' asserted fact that Murphy Sr. threatened his daughter or intended to cause any harm to her.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

Supplemental Report at 1; Trujillo Supplemental Report at 2; M. Murphy Depo. at 112:2-11.  Upon

their arrival, SWAT officers relieved the patrol officers of their inner perimeter responsibilities.  See

Holloway Supplemental Report at 1; Sanders Supplemental Report at 1; Trujillo Supplemental

Report at 1.  As APD CNT members arrived, these CNT officers replaced the patrol officers who

were speaking with Murphy Sr.  See Sanders Supplemental Report at 2.  Meanwhile, the SWAT

team began to develop an emergency hostage rescue plan.  See Albuquerque Police Department

Interview of Officer Russell Carter at 14:3-16:7 (dated June 5, 2007), filed August 16, 2011 (Doc.

103-10)("Carter Interview").  Additionally the entry team took positions on the east side of the target

residence.  See Carter Interview at 12:13-15.

       The chain of command at the scene was Johnston, the acting Lieutenant who was the tactical

commander in charge of the scene, and Gaunterman, who was in charge of the entry decision.  See

Deposition of Charles D. Hedrick at 5:6-6:8, filed September 12, 2011 (Doc. 123-1)("Hedrick

Depo.").  In Gaunterman's absence, Officer Charles Hedrick was the entry team leader.  See Hedrick

Depo. at 5:6-6:8.  The chain of command did not include Defendant Russell Carter.  See Deposition

of Officer Russell Carter at 10:1-15, filed September 12, 2011 (Doc. 123-2)("Carter Depo #2").

Shortly after Carter arrived at the scene, he decided to "pick up the ball and run with it."  Carter

Depo. #2 at 10:1-15.  Carter did so by not asking for permission to take additional action, but by

telling entry team leader Hedrick what he was going to do.  See Response at ¶ 3, at 3 (setting forth

this fact); Reply at 1 (not disputing this fact).  At the time Carter put himself in charge, he knew that

there had been some negotiations with the people in the house, but he did not know who had

conducted these negotiations, what progress had been made, or what had been said.  See Carter

Depo. #2 at 7:10-9:6.

       Defendant APD SWAT Officer Josh Brown was the point man on the entry team.  See

Deposition of Officer Russell Carter at 41:13-20 (dated July 25, 2011), filed August 16, 2011 (Doc. 103-11)("Carter Depo."). APD Officer Carter, entered 1612 Spence SE and took a position in a west side, upstairs bedroom. See Carter Interview at 20:12-22:11. 1612 Spence SE is adjacent to and immediately east of 1608 Spence SE. See Carter Interview at 22:3-11. From the second story window on the west side of 1612 Spence SE, Carter could see directly into the second story bedroom of 1608 Spence SE. See Carter Interview at 22:3-11. During the time that Carter was positioned at 1612 Spence SE, Carter was able to observe Murphy Sr. and M. Murphy who were both located in M. Murphy's second story bedroom at 1608 Spence SE. See M. Murphy Depo. at 123:24-124:14; Carter Interview at 25:3-9. Carter's understanding was that he could not legally order a warrantless entry and SWAT team assault into the home unless there was an immediate threat of death to someone inside the home. See Carter Depo. #2 at 11:23-12:10. Specifically, in M. Murphy's case, Carter's understanding was that an immediate or imminent threat would exist if she was in the same room and in close proximity to Murphy Sr. See Carter Depo. #2 at 14:3-19. Likewise, Carter understood that he could not shoot at and try to kill Murphy Sr. unless the same circumstances existed which would justify ordering the SWAT assault. See Response ¶ 7, at 4 (setting forth this fact); Reply at 1 (not disputing this fact). Carter understood that Murphy Sr. might use deadly force in trying to defend his home from a SWAT invasion, and knew that absent exigent circumstances, such self-defense is a homeowner's right. See Carter Depo. #2 at 19:6-22.

James' police procedures expert, Robert Jones, testified that, before Carter fired a shot at Murphy Sr., Carter knew that Murphy Sr. had committed the inherently violent crime of aggravated assault against Bandera. See Deposition of Robert Jones at 166:24-167:5, 167:10-14 (taken July 26, 2011), filed August 16, 2011 (Doc. 103-12)("Jones Depo."). Jones also testified that, before Carter fired his shot at Murphy Sr., Carter knew that Murphy Sr. committed the violent crime of false

imprisonment against M. Murphy.  See Jones Depo. at 166:16-18, 167:15-19.  Carter stated that he

did not know what crimes, if any, Murphy Sr. had committed.  See Carter Depo. #2 at 7:10-9:6.[5]

Before Carter fired his shot at Murphy Sr., Carter knew that Murphy Sr. was armed with a dangerous

weapon -- a knife.  See Jones Depo. at 169:1-13.  While Murphy Sr. and M. Murphy were upstairs,

Murphy Sr. asked M. Murphy to bring him a glass of water.  See M. Murphy Depo. at 122:15-18.

To retrieve the glass of water, M. Murphy exited the bedroom and proceeded down a hallway, which

shared an adjoining wall with M. Murphy's room, and led to the top of a staircase that descended

to the first floor where the kitchen is located.  See M. Murphy's Depo. at 125:18-126:8.  As M.

Murphy walked through the hallway, an interior wall concealed her from the view of Murphy Sr.

and Carter.  See M. Murphy Depo. at 125:25-127:8.  Similarly, the interior wall prevented M.

Murphy from seeing Murphy Sr. and Carter as she walked through the hallway.  See M. Murphy

Depo. at 125:25-126:8.

　　　Carter then fired one round from his rifle.  See Carter Interview at 32:17-33:1.  Carter aimed

this shot at Murphy Sr.  See Carter Interview at 33:10-12.  This round did not strike Murphy Sr. or

M. Murphy and did not cause them any physical injuries.  See MSJ ¶ 52, at 10 (setting forth this

fact); Response at 2-3 (not disputing this fact).  As M. Murphy walked through a hallway to the

stairs, a bullet pierced through the wall and almost struck her.  See M. Murphy Depo. at 126:18-

127:7.  Although the trajectory of the bullet was close to M. Murphy, Officer Carter's round did not

strike M. Murphy or cause her any physical injuries.  See M. Murphy Depo. at 131:2-7.  After the

---

[5]While Carter's testimony regarding his knowledge of what specific crimes Murphy Sr. had
committed and Jones' testimony regarding what crimes Carter would have known Murphy Sr. had
committed are in tension, neither party has disputed these facts.  The Court will construe the facts
in a manner most favorable to James, the non-moving party.  See Hunt v. Cromartie, 526 U.S. at
551.  The Court will assume, for purposes of this motion, that Carter did not know the specific
crimes that Murphy Sr. had committed.

bullet struck another wall, M. Murphy ran downstairs and into the kitchen of her house.  See M.

Murphy Depo. at 131:8-16.  At the time Carter decided to use deadly force to try and shoot Murphy

Sr., Carter thought Murphy Sr. was closing the distance in the upstairs bedroom towards M. Murphy,

with the knife raised over his head.  See Carter Depo. #2 at 21:5-15, 23:6-14.  Carter thought M.

Murphy was still in the room and in Murphy Sr.'s and the knife's immediate vicinity when he

decided to use deadly force.  See Carter Depo. #2 at 23:6-14, 24:4-19.[6]  Carter admits that he was

not authorized to use deadly force if M. Murphy was not in the room at that time.  See Carter Depo.

#2 at 24:4-19.  Although Hedrick, the team entry leader, has tried to say that he felt M. Murphy was

in imminent danger such that exigent circumstances existed to order the SWAT assault once she

closed the window and went upstairs, he has also admitted that, up until the time Carter took action,

circumstances had not risen to the level that would justify the assault.  See Hedrick Depo. at 25:16-

25.  When Hedrick entered the Murphy home, there were so many SWAT team members on the

stairs that he could not go up the stairs.  See Hedrick Depo. at 30:11-18.  He then turned to the

kitchen where he found M. Murphy.  See Hedrick Depo. at 31:13-23.  Brown, the lead SWAT team

member, dropped a flash bang "as he led to [sic] other officers up the stairs," which occurred "well

after M. Murphy had gone down the stairs into the kitchen."  Response ¶ 14, at 5 (citing City

Defendants' Motion for Partial Summary Judgment No. II: Dismissal of the Estate's Fourth

Amendment Excessive Force Claim Against Officer Brown ¶ 18, at 5, filed August 16, 2011 (Doc.

104) (admitting this fact)).

---

[6]While these facts about where Carter believed M. Murphy was in relation to Murphy, Sr. and Murphy Sr. approaching M. Murphy with a knife are in tension with the fact that M. Murphy walked out of view before Carter fired the shot, the parties have not disputed these specific facts. The Court will construe the facts in a manner most favorable to James, the non-moving party.  See Hunt v. Cromartie, 526 U.S. at 551.  The Court will assume, for purposes of this motion, that M. Murphy walked out of view before Carter fired the shot.

Paramedic David A Weaver was also upstairs in the house next door with Carter. See Deposition of David A. Weaver at 32:11-24, filed September 12, 2011 (Doc. 123-3)("Weaver Depo."). Weaver contends that he saw Murphy Sr. attacking M. Murphy with a knife when Carter fired. See Weaver Depo. at 32:11-24. Weaver states that he was starting to pull the trigger on his weapon at the moment Murphy Sr. was attacking M. Murphy with the knife, but stopped at that instant, because that is when the flash bangs went off. See Weaver Depo. at 33:24-34:8. Specifically, Weaver remembers that immediately after Carter shot at Murphy Sr., Weaver pulled down the blinds, used his weapon to break some glass out of his way, trained his weapon on Murphy Sr. who was attacking M. Murphy as she was falling, and prepared to fire when the flash bangs went off. See Weaver Depo. at 35:4-36:25. Weaver testified that only a few seconds passed between Carter's shot and the flash bangs going off, at which time M. Murphy was in the room, falling down under her father's knife. See Weaver Depo. at 35:4-36:25. M. Murphy asserted that she was not in the room with her father when Carter decided to use deadly force. See Affidavit of Mariah Murphy ¶ 4, at 1, filed September 12, 2011 (Doc. 123-4)("M. Murphy Aff."). She had left the room and was on her way down stairs to get her father something to drink when Carter's shot came through a wall in front of her face. See M. Murphy Aff. ¶ 4-5, at 1. According to Jones, any reasonable law enforcement officer in Carter's position knew or should have known it was more likely than not that Murphy Sr. would attempt to protect himself, his daughter, and his home with deadly force, and that the SWAT team would likewise respond with deadly force. See Affidavit of Robert L. Jones ¶ 1, at 1, filed September 12, 2011 (Doc. 123-5)("Jones Aff."). Carter did not subsequently restrain, arrest, or imprison Murphy Sr. See MSJ ¶ 53, at 10 (setting forth this fact); Response at 2-3 (not disputing this fact). After Carter fired this first shot, he did not have any interaction with Murphy Sr. See MSJ ¶ 54, at 10 (setting forth this fact); Response at 2-3 (not

disputing this fact).  Jones concluded that Carter's use of deadly force was unjustified.  See Jones Depo. at 160:16-18.  Jones did not say in his expert witness report or testify in his deposition that Carter's use of deadly force shocked the conscience.  See MSJ ¶ 55, at 10 (setting forth this fact); Response at 2-3 (not disputing this fact).

Carter did not intend this shot that he fired at Murphy Sr. -- a shot that missed -- to almost strike M. Murphy.  See MSJ ¶ 59, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  Carter did not know nor should he have known that the shot he fired at Murphy Sr. would almost strike M. Murphy.  See MSJ ¶ 60, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  Carter did not restrain, arrest, imprison, or otherwise treat M. Murphy as if she was a suspect.  See MSJ ¶ 61, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  Carter did not fire his weapon with intent to harm M. Murphy "or worsen her legal plight."  MSJ ¶ 62, at 11 (setting forth this fact).  After Carter fired this first shot, he did not have any interaction with M. Murphy.  See MSJ ¶ 63, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  Carter did not "intentionally seize[] or otherwise willfully acquire[] physical control over Mariah."  MSJ ¶ 64, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  Defendants Martin J. Chavez, Ray Schultz, and the City of Albuquerque (the "City Defendants"), did not treat these individuals differently than other similarly situated criminal suspects and citizens.  MSJ ¶ 65, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  A racial animus against the Murphy family did not motivate the City Defendants' actions.  See MSJ ¶ 66, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  A racial animus did not motivate Carter or Brown's use of deadly force against the Murphy Sr. or M. Murphy.  See MSJ ¶ 67, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).

## PROCEDURAL BACKGROUND

On June 6, 2009, James filed her Verified Complaint for Negligence and Civil Rights Abuse (Police Misconduct) Including But Not Limited to Wrongful Death. See Doc. 1 ("Original Complaint"). The Original Complaint was verified. See Original Complaint at 23. On July 2, 2009, James filed her Verified First Amended Complaint for Negligence and Civil Rights Abuse (Police Misconduct) Including But Not Limited to Wrongful Death. See Doc. 3 ("Amended Complaint"); id. at 25 (verification).

On August 16, 2011, the Defendants filed their first Motion for Summary Judgment. In this Motion for Summary Judgment, they seek dismissal of the claims against Carter. See MSJ at 1-2. Specifically, the Defendants argue that Carter's qualified immunity defense precludes James' Fourth and Fourteenth Amendment claims. See MSJ at 2. First, the Defendants argue that the Court should enter summary judgment on the Fourth Amendment claims against Carter, because there is no evidence that a seizure of Murphy Sr. or M. Murphy occurred. See MSJ at 2. Second, they argue that neither Murphy Sr. or M. Murphy can state an actionable Fourteenth Amendment excessive force claim, because Carter's decision to fire his weapon does not shock the conscience. See MSJ at 2. Third, they argue that the Court should enter judgment on James' Equal Protection Clause claims because there is no evidence that the officers treated Murphy Sr., M. Murphy, or James differently than similarly situated suspects and citizens. See MSJ at 2.

On September 12, 2011, James filed her Response to the Defendants' Motion for Summary Judgment. James contends that Carter's use of deadly force was not constitutional unless M. Murphy was in imminent mortal danger. See Response at 6. Additionally, James argues that Carter's use of force was not objectively reasonable under the circumstances. See Response at 7-8. James did not specifically respond to the Defendants' argument that no seizure occurred when Carter

fired his weapon.  James also argues that Carter's decision to order the SWAT team to enter the home was presumptively unconstitutional and objectively unreasonable.  <u>See</u> Response at 8-10. Furthermore, James argues that Carter's conduct, specifically his conclusion that exigent circumstances justified the decision to use deadly force against Murphy Sr., shocks the conscious. <u>See</u> Response at 11-13.  James did not specifically respond to the Defendants' argument that no Equal Protection Clause violation occurred.

On September 19, 2011, the Defendants filed their Reply.  They argue that James has failed to specifically controvert their Motion for Summary Judgment in the manner that rule 56(e) of the Federal Rules of Civil Procedure and the applicable local rules require, and thus the Court should deem those facts admitted.  <u>See</u> Reply at 2-5.  They also contend that James cannot create a disputed issue of material fact by putting together her own version of the facts with the Defendants' version of the facts.  <u>See</u> Reply at 5-7.  They point out that James has put forward no evidence that Carter intentionally seized M. Murphy or Murphy Sr.  <u>See</u> Reply at 7-8.  The Defendants also argue that the Court should not consider James' arguments regarding the officers illegal entry into the Murphy home because James never brought such a claim in her Amended Complaint.  <u>See</u> Reply at 8.  They also contend that James cannot state an actionable Fourteenth Amendment claim based on Carter's alleged negligent acts.  <u>See</u> Reply at 9-10.

The Court held a hearing on October 4, 2011.  At the hearing, James clarified that Murphy Jr. is not asserting any claims against the Defendants and was never joined as a party in the Amended Complaint.  <u>See</u> Transcript of Hearing at 5:11-21 (taken October 4, 2011)(Lyle)("Oct. 4, 2011 Tr.").[7]  James clarified that her intentions are only to assert individual claims against Carter

---

[7]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited versions.  Any final transcripts may contain slightly different page and/or line numbers.

and that she does not intend to contest dismissal of the individual claims against the other police officers in the case.  See Oct. 4, 2011 Tr. at 3:15-21 (Lyle).  James did not contest voluntarily dismissing her Equal Protection claims with respect to the Motion for Summary Judgment.  See Oct. 4, 2011 Tr. at 22:1-11, 33:25-34:4 (Robles, Court, Lyle).  James also clarified that there was no separate Fourteenth Amendment claim beyond the substantive due-process claims that she has asserted.  See Oct. 4, 2011 Tr. at 38:1-4 (Court, Lyle).

With respect to the issues raised in the Motion for Summary Judgment, James emphasized that she has conceded only that the officers in the SWAT entry team did not know that the order they received was illegal.  She reiterated that Murphy Sr. had every right to use deadly force to defend himself based on the illegal entry.  See Oct. 4, 2011 Tr. at 17:3-15 (Lyle).  The Court questioned whether the officers' subjective intent mattered with respect to the issue whether exigent circumstances existed.  See Oct. 4, 2011 Tr. at 18:2-12 (Court).  James pointed out that Carter was the one who ordered the SWAT team to enter the home and that, from his perspective, a reasonable officer would not have concluded that exigent circumstances existed.  See Oct. 4, 2011 Tr. at 18:13-19:4 (Lyle).  The Defendants reiterated that no seizure occurred, because no submission occurred when Carter made a show of force.  See Oct. 4, 2011 Tr. at 24:6-15 (Robles).  Furthermore, they argue that no seizure occurred, because the bullet Carter fired never hit M. Murphy or Murphy Sr. See  Oct. 4, 2011 Tr. at 24:18-23 (Robles).  With respect to M. Murphy, the Defendants noted that Carter did not intend to fire at her, but rather to fire at Murphy Sr., which undercuts James' Fourth Amendment claims.   See   Oct. 4, 2011 Tr. at 24:21-25:15 (Robles).   The Defendants then emphasized that the undisputed facts in this case indicate that no substantive due-process violation occurred with respect to Murphy Sr.  See Oct. 4, 2011 Tr. at 25:16-22 (Robles).  They contend that Murphy Sr.'s own conduct led to the situation where Carter had to fire his weapon at Murphy Sr.

-16-

See Oct. 4, 2011 Tr. at 25:16-22 (Robles).  With respect to M. Murphy, the Defendants argued that Carter could not see her when he fired the bullet, indicating that he did not intend to direct the bullet at her.  See  Oct. 4, 2011 Tr. at 26:23-27:3 (Robles).

James sought to distinguish some of the Defendants' authority regarding seizures based on the factual distinction that Murphy Sr. and M. Murphy were in their home rather in some type of vehicle or public place.  See Oct. 4, 2011 Tr. at 29:4-19 (Lyle).  James also contended that there were no exigent circumstances justifying Carter's conduct.  See Oct. 4, 2011 Tr. at 29:15-30:23 (Lyle).  James argued that a jury should be able to decide the issue of Carter's intent with respect to his actions.  See Oct. 4, 2011 Tr. at 30:5-25 (Lyle).  The Defendants reiterated at the hearing that James did not raise her claims regarding the officers' illegal entry in the home in her pleadings.  See Oct. 4, 2011 Tr. at 38:6-39:6 (Robles).  James argued that one can glean from the Amended Complaint the assertion of this claim.  See Oct. 4, 2011 Tr. at 39:17-19 (Lyle).  In the alternative, James asked for leave to amend her Amended Complaint.  See Oct. 4, 2011 Tr. at 39:20-25 (Lyle).

At the pre-trial conference on October 28, 2011, the parties agreed that the Court could go ahead and address these unlawful entry claims raised in the Response without requiring James to formally seek leave to amend her Amended Complaint.  See Transcript of Hearing at 8:20-10:2 (taken October 28, 2011)(Court, Lyle, Robles)("Oct. 28, 2011 Tr.").

## LEGAL STANDARD FOR MOTIONS FOR SUMMARY JUDGMENT

Rule 56(c) of the Federal Rules of Civil Procedure states that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." Bacchus Indus., Inc. v.

Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)(internal quotation marks omitted).  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant meets this burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).  Rule 56 provides that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his [or her] pleadings."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("However, 'once a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried.'" (citation omitted)).  Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. Co. v. Omer, No. 07-2123, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(citing Fed. R. Civ. P.

-18-

56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. Co. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

Genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact-finder could reasonably find for the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable . . . or is not significantly probative, . . . summary judgment may be granted."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

When reviewing a motion for summary judgment, the court should keep in mind three principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 249.  Second, the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving

party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Anderson v. Liberty Lobby, Inc., 477 U.S. at 255

("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn

in his favor.").  Third, the court cannot decide any issues of credibility.  See Anderson v. Liberty

Lobby, Inc., 477 U.S. at 255.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority."  Harlow v. Fitzgerald, 457 U.S. at 807.  "Qualified immunity protects federal and state

officials from liability for discretionary functions, and from 'the unwarranted demands customarily

imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. 08-

0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley,

500 U.S. 226, 232 (1991)).  Issues of qualified immunity are best resolved at the "earliest possible

stage in litigation."  Pearson v. Callahan, 555 U.S. 223, 230-31 (2009)(quoting Hunter v. Bryant,

502 U.S. 224, 227 (1991)(per curiam)).

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would

have known."  Pearson v. Callahan, 555 U.S. at 230-31 (quoting Harlow v. Fitzgerald, 457 U.S. 800,

818 (1982)).  When a defendant asserts qualified immunity at summary judgment, the responsibility

shifts to the plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d 1124, 1128

(10th Cir. 2001).  The plaintiff must demonstrate on the facts alleged: (i) that the defendant's actions

violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at

the time of the alleged unlawful activity.  See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir.

2009).

1.      **Factual Disputes in the Qualified-Immunity Analysis**.

In determining whether the plaintiff has met his or her burden of establishing a constitutional

violation that was clearly established, the court construes the facts in the light most favorable to the

plaintiff as the non-moving party.  See Scott v. Harris, 550 U.S. 372, 378-80 (2007); Riggins v.

Goodman, 572 F.3d at 1107 (noting that the United States Court of Appeals for the Tenth Circuit

"accept[s] the facts and the plaintiff alleges them").  In Thomson v. Salt Lake County, 584 F.3d

1304 (10th Cir. 2009), the Tenth Circuit explained:

> [B]ecause at summary judgment we are beyond the pleading phase of the litigation,
> a plaintiff's version of the facts must find support in the record: more specifically,
> "[a]s with any motion for summary judgment, when opposing parties tell two
> different stories, one of which is blatantly contradicted by the record, so that no
> reasonable jury could believe it, a court should not adopt that version of the facts[.]"
> York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott [v.
> Harris], 550 U.S. at 380); see also Estate of Larsen ex. rel Sturdivan v. Murr, 511
> F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cnty., 584 F.3d at 1312.  "The Tenth Circuit, in Rhoads v. Miller explained

that the blatant contradictions of the record must be supported by more than other witnesses'

testimony[.]"  Lymon v. Aramark Corp., 728 F.Supp.2d 1222, 1249 (D.N.M. 2010)(Browning,

J.)(citation omitted).

> In evaluating a motion for summary judgment based on qualified immunity, we take
> the facts "in the light most favorable to the party asserting the injury."  Scott v.
> Harris, 550 U.S. 372, 377 (2007).  "[T]his usually means adopting . . . the plaintiff's
> version of the facts," id. at 378, unless that version "is so utterly discredited by the
> record that no reasonable jury could have believed him," id. at 380.  In Scott, the
> plaintiff's testimony was discredited by a videotape that completely contradicted his
> version of the events.  550 U.S. at 379.  Here, there is no videotape or similar
> evidence in the record to blatantly contradict Mr. Rhoads' testimony.  There is only
> other witnesses' testimony to oppose his version of the facts, and our judicial system
> leaves credibility determinations to the jury.  And given the undisputed fact of injury,
> Mr. Rhoads' alcoholism and memory problems go to the weight of his testimony, not
> its admissibility. . . . Mr. Rhoads alleges that his injuries resulted from a beating
> rendered without resistence or provocation.  If believed by the jury, the events he
> describes are sufficient to support a claim of violation of clearly established law

-21-

under Graham v. Connor, 490 U.S. 386, 395-96 (1989), and this court's precedent.

Rhoads v. Miller, 352 F.App'x 289, 291-92 (10th Cir. 2009)(unpublished)(internal quotation marks omitted).  See Lymon v. Aramark Corp., 728 F.Supp.2d at 1249-50 (quoting Rhoads v. Miller, 352 F.App'x at 291-92).   In a concurring opinion in Thomson v. Salt Lake County, the Honorable Jerome A. Holmes, United States Circuit Judge for the Tenth Circuit, stated that courts must focus first on the legal question of qualified immunity and "determine whether plaintiff's factual allegations are sufficiently grounded in the record such that they may permissibly comprise the universe of facts that will serve as the foundation for answering the legal question before the court" before inquiring into whether there are genuine issues of material fact for resolution by the jury. 584 F.3d at 1326-27 (Holmes, J. concurring)(citing Goddard v. Urrea, 847 F.2d 765, 770 (11th Cir. 1988)(Johnson, J., dissenting)(observing that, even if factual disputes exist, "these disputes are irrelevant to the qualified immunity analysis because that analysis assumes the validity of the plaintiffs' facts.")).

## 2. **Clearly Established Rights.**

In evaluating whether the right was clearly established, the court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d 905, 923 (10th Cir.

2001).  See Medina v. City & Cnty. of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992).  On the other hand, the Supreme Court of the United States has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(quoting Saucier v. Katz, 533 U.S. 194, 202 (2001), overruled on other grounds by Pearson v. Callahan, 555 U.S. 194).

        The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified-immunity defense.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 235-36.  The Supreme Court also noted in Pearson v. Callahan that, while no longer mandatory, the protocol outlined in Saucier v. Katz will often be beneficial.  See 555 U.S. at 235-36.  Once the plaintiff has established the inference that the defendant's conduct violated a clearly established constitutional right, a qualified immunity defense generally fails.  See Cannon v. City & Cnty. of Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

## RELEVANT LAW ON THE FOURTH AMENDMENT

        The Fourth Amendment to the United States Constitution "protects '[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures.'"  United States v. Thompson, 524 F.3d 1126, 1132 (10th Cir. 2008)(quoting U.S. Const. amend. IV).  It also commands that "no Warrants shall issue, but upon probable cause, supported

by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  "The security of one's privacy against arbitrary intrusion by the police -- which is at the core of the Fourth Amendment -- is basic to a free society." Wolf v. Colorado, 338 U.S. 25, 27 (1949), overruled on other grounds by Mapp v. Ohio, 367 U.S. 643 (1961).

### 1.    Seizures and Arrests.

"[W]hether a particular seizure is reasonable is dependent on the 'totality of the circumstances.'" Ryder v. City of Topeka, 814 F.2d 1412, 1419 n.16 (10th Cir. 1987).  An arrest constituting a seizure occurs when there is the exercise of a certain degree of physical force or submission to the assertion of authority.  See California v. Hodari, 499 U.S. 621, 626 (1991).  The Tenth Circuit has identified several factors that are relevant in determining whether a person has been seized within the meaning of the Fourth Amendment. They include:

> 1) The threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects; 6) a request to accompany the officer to the station; 7) interaction in a nonpublic place or a small, enclosed space; 8) and absence of other members of the public.

Jones v. Hunt, 410 F.3d 1221, 1226 (10th Cir. 2005)(internal quotation marks omitted). Additionally, "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control.  A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful."  Brower v. Cnty. of Inyo, 489 U.S. 593, 596 (1989).

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. 1, 7 (1985).  "To determine

the constitutionality of a seizure '[courts] must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'"   Tennessee v. Garner, 471 U.S. at 8.   The balance of these competing interests is one of the key principles underlying the Fourth Amendment. See Tennessee v. Garner, 471 U.S. at 8.   "Because one of the factors is the extent of the intrusion, it is plain that reasonableness depends on not only when a seizure is made, but also how it is carried out."   Tennessee v. Garner, 471 U.S. at 8.

The Tenth Circuit has recognized that the use of a taser on a person, although it does not constitute deadly force, results in a seizure of the victim. See Cavanaugh v. Woods Cross City, 625 F.3d 661, 665 (10th Cir. 2010).   The Tenth Circuit assumed without deciding that, when a person in a vehicle was shot, but that shot initially failed to stop the person's progress, that a seizure had occurred. See Thomas v. Durastanti, 607 F.3d 655, 663 (10th Cir. 2010)("Even assuming without deciding Mr. Thomas can meet the seizure element of his claim, however, he cannot show that it was unreasonable.").   The Tenth Circuit noted that the plaintiff in that case's argument relied on dicta in the Supreme Court's decision in California v. Hodari to the effect that "the 'application of physical force to restrain movement, even when it is ultimately unsuccessful' is a seizure." Thomas v. Durastanti, 607 F.3d at 663.   On the other hand, when a police officer shot at a person piloting a helicopter, who had been taken hostage at gunpoint and required to assist in the escape, and successfully hit the helicopter once, the Tenth Circuit concluded that no seizure had occurred; the Tenth Circuit found that the plaintiff had not submitted to the show of authority as he continued to flee once officers hit the helicopter.   See Bella v. Chamberlain, 24 F.3d 1251, 1256 (10th Cir. 1994)("The shots constituted an assertion of authority, but they did not cause Mr. Bella to submit nor did they otherwise succeed in stopping him.   Indeed, Mr. Bella does not contend seriously that

he was 'seized' prior to the time he was actually arrested at the Albuquerque International Airport." (footnotes omitted)).  The Tenth Circuit did not find it significant in its analysis that the plaintiff could not submit to the show of authority because he was a hostage held at gunpoint.  See Bella v. Chamberlain, 24 F.3d at 1256 n.5.  The Tenth Circuit also noted that, even if the officer's shot had accidently hit the plaintiff, it was not a foregone conclusion that a Fourth Amendment seizure would have occurred based on the potential lack of intent to cause a seizure.  See Bella v. Chamberlain, 24 F.3d at 1256 n.6.  The Tenth Circuit found in Reeves v. Churchich, 484 F.3d 1244 (10th Cir. 2007), that police pointing their weapons at and making verbal commands to the plaintiffs did not constitute a seizure when the plaintiffs did not submit to the show of authority.  See 484 F.3d at 1252-53 ("[The officers] clearly asserted their police authority by pointing their weapons and making verbal commands.  Nevertheless, in each situation, neither Ashlee nor Alicia submitted to these assertions of authority.").  Addressing some disputed evidence whether the weapon touching one of the plaintiff's faces when one of the officers held the gun at her head would change the result, the Tenth Circuit reiterated that no seizure would occur until the plaintiff submitted to the officer's show of authority.  See Reeves v. Churchich, 484 F.3d at 1253 ("In any event, even assuming Jones' handgun touched Alicia's face, no seizure occurred because she failed to submit to this assertion of authority.").  Noting that one of the plaintiffs was naked and might have reasonably ignored the officers commands by running from the room and pushing the officer's gun from her head, the Tenth Circuit emphasized that these facts would not affect the analysis, because courts must examine a person's decision not to submit from an objectively reasonable standpoint instead of considering their subjective intentions.  See Reeves v. Churchich, 484 F.3d at 1253.  Furthermore, the Tenth Circuit found in Childress v. City of Arapaho, 210 F.3d 1154 (10th Cir. 2000), that no seizure occurred when officers fired into a van at some fugitives, which resulted in the officers accidentally

hitting two hostages -- the plaintiffs -- in the vehicle.  See 210 F.3d at 1155-57.  The Tenth Circuit concluded that no seizure occurred, because the officers accidentally, not intentionally, hit the plaintiffs, as the officers intended to restrain the van and the fugitives rather than the hostages.  See Childress v. City of Arapaho, 210 F.3d at 1157.  As the Tenth Circuit described:

> The police officers in the instant case did not "seize" plaintiffs within the meaning of the Fourth Amendment but rather made every effort to deliver them from unlawful abduction.  The officers intended to restrain the minivan and the fugitives, not Mrs. Childress and Caitlyn.  The injuries inflicted were the unfortunate but not unconstitutional "accidental effects of otherwise lawful conduct."  In keeping with our sister circuits, we hold that no Fourth Amendment seizure occurred in the instant case.

Childress v. City of Arapaho, 210 F.3d at 1157 (quoting Brower v. Cnty. of Inyo 489 U.S. at 596).  The Tenth Circuit reached this conclusion even though the police officers knew that the plaintiffs were in the van with the fugitives.  See Childress v. City of Arapaho, 210 F.3d at 1155-57.

### 2. **Reasonableness of a Seizure.**

With respect to the issue of reasonableness, courts must determine the reasonableness of the use of deadly force from "the totality of the circumstances."  Phillips v. James, 422 F.3d 1075, 1083 (10th Cir. 2005).  "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."  Carr v. Castle, 337 F.3d 1221, 1227 (10th Cir. 2003)(quoting Tennesee v. Garner, 471 U.S. at 11).  As the Tenth Circuit noted:

> Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Carr v. Castle, 337 F.3d at 1227 (quoting Tennesee v. Garner, 471 U.S. at 11).  On the other hand, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm

resulting from failing to apprehend him does not justify the use of deadly force to do so . . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." Tennessee v. Garner, 471 U.S. at 11.  The use of deadly force is justified under the Fourth Amendment "if a reasonable officer in the Defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."  Phillips v. James, 422 F.3d at 1083.  Courts should also consider whether the officers were in danger at the moment that they used force, and whether the officers reckless or deliberate conduct during the seizure unreasonably created the need to use such force.  See Phillips v. James, 422 F.3d at 1083.  Negligent acts that precipitate a confrontation, on the other hand, are not actionable.  See Blossom v. Yarbrough, 429 F.3d 963, 968 (10th Cir. 2005).  A court may consider only events immediately connected with the seizure.  See Blossom v. Yarbrough, 429 F.3d at 968.  Depending on the context, employing the assistance of a SWAT team can render a search unreasonable.  See Phillips v. James, 422 F.3d at 1082.

### 3.    Requirements for Warrantless Entries into the Home.

"[T]he Fourth Amendment protects people, not places," and the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a "constitutionally protected area."  Katz v. United States, 389 U.S. 347, 351 (1967). The proper inquiry is whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable.  See Katz v. United States, 389 U.S. at 351 ("What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected."); Katz v. United States, 389 U.S. at 361 (Harlan, J., concurring)("My understanding of the rule that has emerged from prior decisions is that

there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'").

There is no doubt, however, that a citizen has a reasonable expectation of privacy, and a particularly strong one, in his own home.  The "chief evil" from which the Fourth Amendment protects citizens is unwanted police entry into the home, and the "principal protection" is "the Fourth Amendment's warrant requirement."  United States v. Thompson, 524 F.3d at 1132.  See Kyllo v. United States, 533 U.S. 27, 31 (2001)("'At the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" (quoting Silverman v. United States, 365 U.S. 505, 511 (1961))); Payton v. New York, 445 U.S. 573, 586 (1980)("[S]earches and seizures inside a home without a warrant are presumptively unreasonable.").

Not all searches require a warrant.  The Supreme Court has instructed that, when assessing the reasonableness of a warrantless search, a court must begin "with the basic rule that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.'" Arizona v. Gant, 129 S.Ct. 1710, 1716 (2009)(citing Katz v. United States, 389 U.S. at 357).  See Payton v. New York, 445 U.S. at 586.  As the Tenth Circuit stated in United States v. Cos, 498 F.3d 1115 (10th Cir. 2007): "A warrantless search of a suspect's home is per se unreasonable under the Fourth Amendment unless the government can show that it falls within 'one of a carefully defined set of exceptions.'"  498 F.3d at 1123 (quoting Coolidge v. New Hampshire, 403 U.S. 443, 474 (1971)).  See United States v. Thompson, 524 F.3d at 1132.

"One exception to the warrant requirement is when police reasonably believe an emergency

exists that makes it infeasible to obtain a warrant."  United States v. Gambino-Zavala, 539 F.3d 1221, 1225 (10th Cir. 2008).  "The government bears the burden of proving the exigency exception to the warrant requirement applies."  United States v. Najar, 451 F.3d 710, 717 (10th Cir. 2006)(citing United States v. Wicks, 995 F.2d 964, 970 (10th Cir. 1993)).  "That burden is especially heavy when the exception must justify the warrantless entry of a home."  United States v. Najar, 451 F.3d at 717 (citation omitted).  Generally, a warrantless entry under the exigent-circumstances exception requires probable cause and exigent circumstances.  See Kirk v. Louisiana, 536 U.S. 635, 638 (2002); Manzanares v. Higdon, 575 F.3d 1135, 1142-43 (10th Cir. 2009).  With respect to the standard of review on the existence of exigent circumstances, the Tenth Circuit has stated that: "The existence of exigent circumstances is a mixed question of law and fact.  Although we accept underlying fact findings unless they are clearly erroneous, the determination of whether those facts satisfy the legal test of exigency is subject to de novo review."  United States v. Davis, 290 F.3d 1239, 1241 (10th Cir. 2002).

Additionally, the Tenth Circuit appears to have recognized a subset of exigent-circumstances cases -- "emergency-aid" cases -- that do not require probable cause.  United States v. Najar, No. 03-0735, 2004 WL 3426123, at *6 (D.N.M. Sept. 3, 2004)(Browning, J.), aff'd, 451 F.3d 710 (10th Cir. 2006).  As the Court stated in United States v. Najar:

> For probable cause in the usual [evidence-of-crime] sense not to be needed, the police must be responding to a true emergency rather than a crime, and the police must reasonably believe a person inside needs immediate assistance, and entry is needed to protect or preserve life, or to avoid serious injury.

United States v. Najar, 2004 WL 3426123, at *6 (alteration original).  In the Tenth Circuit's opinion in United States v. Najar, the Tenth Circuit held that the exigent-circumstances exception to the warrant requirement authorized a warrantless police entry in an emergency-aid situation without a

-30-

showing of probable cause.  In so doing, the Tenth Circuit noted that the Supreme Court in <u>Brigham City, Utah v. Stuart</u>, which was determining "whether the risk of personal danger created exigent circumstances," did not "require probable cause in this type of exigent circumstances."  <u>United States v. Najar</u>, 451 F.3d at 718 (emphasis added).

In such emergency-aid situations, the Tenth Circuit employs a two-pronged test to determine whether emergency circumstances justify a warrantless entry into a home, which examines: "whether (1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable."  <u>United States v. Najar</u>, 451 F.3d at 717-18.  A court is "guided by the realities of the situation presented by the record," and should consider the facts from the viewpoint of "prudent, cautious, and trained officers."  <u>United States v. Porter</u>, 594 F.3d 1251, 1258 (10th Cir. 2010)(citation omitted).  "Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard."  <u>United States v. Porter</u>, 594 F.3d at 1258 (citation omitted).  "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception."  <u>United States v. Porter</u>, 594 F.3d at 1258 (citation omitted).  A court must also, however, remember that officers cannot create their own exigent circumstances to justify a warrantless entry.  <u>See</u> <u>United States v. Flowers</u>, 336 F.3d 1222, 1230 (10th Cir. 2003).  In the limited circumstances where the risk of danger to the officers or others gives rise to the exigent circumstance, the court does not require a separate showing of probable cause.  <u>See</u> <u>United States v. Najar</u>, 451 F.3d at 718.

### 4.    <u>Law Regarding Excessive Force</u>.

An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard."

Graham v. Connor, 490 U.S. at 394.  The Supreme Court has long held that all claims of excessive

force in the context of an arrest or detention should be analyzed under the Fourth Amendment's

reasonableness standard.   See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law

enforcement officers have used excessive force -- deadly or not -- in the course of an arrest,

investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth

Amendment and its 'reasonableness' standard . . . .").  The Supreme Court recognizes that "police

officers are often forced to make split-second judgments -- in circumstances that are tense,

uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular

situation." Graham v. Connor, 490 U.S. at 397.  Consequently, "the reasonableness of the officer's

belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier

v. Katz, 533 U.S. at 205.  When an officer moves for qualified immunity on an excessive-force

claim, "a plaintiff is required to show that the force used was impermissible (a constitutional

violation) and that objectively reasonable officers could not have thought the force constitutionally

permissible (violates clearly established law)." Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir.

2007).

     **a.**     **Relevant Factors in Determining Whether Officers' Actions Were
Objectively Reasonable.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when

determining whether force was objectively reasonable.  In Estate of Larsen v. Murr, 511 F.3d 1255

(10th Cir. 2008), the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of
> non-exclusive factors.  These include (1) whether the officers ordered the suspect to
> drop his weapon, and the suspect's compliance with police commands; (2) whether
> any hostile motions were made with the weapon towards the officers; (3) the distance
> separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260.  In Weigel v. Broad, 544 F.3d 1143 (10th Cir.2008), the Tenth Circuit also
provided:

> Reasonableness is evaluated under a totality of the circumstances approach which
> requires that we consider the following factors: the severity of the crime at issue,
> whether the suspect poses an immediate threat to the safety of the officers or others,
> and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  The court assesses "objective reasonableness based on
whether the totality of the circumstances justified the use of force, and pay careful attention to the
facts and circumstances of the particular case."  Estate of Larsen v. Murr, 511 F.3d at 1260 (internal
quotation marks omitted).

### b.      Least- or Less-forceful Alternatives in Excessive-Force Cases.

To avoid a "Monday morning quarterback" approach, the Fourth Amendment does not
require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long
as the use of force is reasonable under Graham v. Connor.  The Fourth Amendment requires only
that the defendant officers chose a "reasonable" method to end the threat that the plaintiff posed to
the officers in a force situation, regardless of the availability of less intrusive alternatives.  Graham
v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Supreme
Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated
that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the
> decision as to which among reasonable alternative law enforcement techniques
> should be employed to deal with a serious public danger.  Experts in police science
> might disagree over which of several methods of apprehending drunken drivers is
> preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice
> among such reasonable alternatives remains with government officials who have a
> unique understanding of, and a responsibility for, limited public resources, including
> a finite number of police officers.

496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means.").  To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the method chosen is reasonable.

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the Terry[8] stop of a suspected drug courier in an airport.  The Supreme Court rejected Sokolow's contention that the arresting officers were "obligated to use the least intrusive means available to dispel their suspicions that he was smuggling narcotics." 490 U.S. at 11.  Instead, the Supreme Court held: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques.  Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing." United States v. Sokolow, 490 U.S. at 11 (internal quotations and citations omitted).  Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished.  But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit disagreed with the plaintiff's contention that expert testimony about when a police dog's use is objectively reasonable and about how defendant Lehocky's actions violated "well established law

---

[8] Terry v. Ohio, 392 U.S. 1 (1968).

-34-

enforcement standards . . . should have been admitted since it would have been helpful to the jury in determining whether Lehocky used a reasonable amount of force."  399 F.3d at 1222.  In so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not require [police] to use the least intrusive means in the course of a detention, only reasonable ones." United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994). Similarly, "violations of state law and police procedure generally do not give rise to a [42 U.S.C. §] 1983 claim" for excessive force. Romero v. Bd. of County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995) (holding that "violation of a police department regulation is insufficient for liability under section 1983" for excessive force). Both of these principles of our Fourth Amendment jurisprudence stem from the proper perspective from which to evaluate the conduct of a police officer -- that "of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." Olsen [v. Layton Hills Mall], 312 F.3d [1304,] 1314 [ (10th Cir.2002) ].  Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions." [United States v.] Melendez-Garcia, 28 F.3d at 1052
>
> Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez.  In making this determination, the issues of whether Lehocky used the minimum amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related.  This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably. [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cnty. Comm'rs, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994), the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones."  28 F.3d at 1052 (internal quotations omitted).  See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)(citation omitted)); Dickerson

-35-

v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment. . . .  Officers thus need not avail themselves of the least intrusive means of responding to an exigent situations; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases.  The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under Tennessee v. Garner and Graham v. Connor.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative."  Jonas v. Bd. of Comm'rs of Luna Cnty., 699 F.Supp.2d 1284, 1296 (D.N.M. 2010)(Browning, J.).  See, e.g., Blossom v. Yarbrough, 429 F.3d at 968 (quoting Medina v. Cram, 252 F.3d at 1133)("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable).  See also Roy v. Inhabitants of the City

of Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F.Supp. at 1100.  Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means."  Illinois v. Lafayette, 462 U.S. 640, 647-48 (1983).  The Court has also rejected the consideration of a less intrusive alternative to end a threat.  See Chamberlin v. City of Albuquerque, No. 02-0603, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

## LAW REGARDING SUBSTANTIVE DUE-PROCESS RIGHTS

"The touchstone of due process is protection of the individual against arbitrary action of government . . . whether the fault lies in a denial of fundamental procedural fairness . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  Graves v. Thomas, 450 F.3d 1215, 1220 (10th Cir. 2006)(quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)).  Because "only the most egregious conduct can be said to be 'arbitrary in the constitutional sense,'" Cnty. of Sacramento v. Lewis, 523 U.S. at 846 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 129 (1992)), the Supreme Court has been reluctant to expand the doctrine of substantive due process, and has cautioned that "[o]nly fundamental rights and liberties which are 'deeply rooted in this Nation's history and tradition' and 'implicit in the concept of ordered liberty' qualify for such protection,"  Chavez v. Martinez, 538 U.S. 760, 775 (2003)(quoting Washington v. Glucksberg, 521 U.S. 702, 721 (1997)).  See Graves v. Thomas, 450 F.3d at 1220 ("Substantive due process claims are not based on state law but are founded upon deeply rooted notions of fundamental personal interests derived from the Constitution." (quoting

Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir. 1998))).

The ultimate measure whether conduct by state actors violates due process is whether "the challenged government action 'shocks the conscience' of federal judges." Ruiz v. McDonnell, 299 F.3d 1173, 1183 (10th Cir. 2002)(quoting Uhlrig v. Harder, 64 F.3d 567, 573 (10th Cir. 1995)). To succeed on a substantive due-process claim, a "plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d 1214, 1223 (10th Cir. 2006)(quoting Uhlrig v. Harder, 64 F.3d at 574). More specifically, "a § 1983 violation based on substantive due process 'must be predicated on a state action manifesting one of two traditional forms of wrongful intent -- that is, either (1) an intent to harm; or (2) an intent to place a person unreasonably at risk of harm." Ward v. Anderson, 494 F.3d 929, 938 (10th Cir. 2007)(quoting Uhlrig v. Harder, 64 F.3d at 573). In determining whether a defendant's actions shock the conscience, three principles guide a court's analysis: (i) the need for restraint in defining the scope of substantive due process; (ii) the recognition that 42 U.S.C. § 1983 should not be used to replace state tort law; and (iii) the propriety of deferring to local policymakers' decisions regarding public safety. See Valdez v. New Mexico, 109 F.App'x 257, 262 (10th Cir. 2004); Ruiz v. McDonnell, 299 F.3d at 1184. Lastly, ordinary negligence does not shock the conscience, and even permitting unreasonable risks to continue is not necessarily conscience shocking. Rather, a plaintiff must demonstrate a degree of outrageousness, and a magnitude of potential or actual harm, that is truly conscience shocking. See Ruiz v. McDonnell, 299 F.3d at 1184.

## ANALYSIS

The Court will grant summary judgment on James' excessive force claims asserted under a Fourth Amendment theory as Carter did not seize Murphy Sr. or M. Murphy within the meaning

of the Fourth Amendment.  Because James' unlawful entry claims are not in the Amended

Complaint, and because James would have to move to amend to add these claims to the case, the

Court will deny leave to amend.  Granting leave to amend on the unlawful entry claims would be

futile.  The Court will enter summary judgment on James' unlawful entry claims as exigent

circumstances justified Carter's conduct in ordering the SWAT raid and his conduct was reasonable.

The Court will grant summary judgment on James' unlawful entry claims as no unlawful entry

occurred based on the existence of exigent circumstances and Carter acted reasonably in ordering

the SWAT raid.  The Court will grant summary judgment with respect to James' excessive force

claims asserted under a substantive due-process theory, because James has not demonstrated that

Carter's conduct shocks the conscience or that his conduct violated any clearly established law.

Because James has voluntarily agreed to dismiss her Equal Protection Clause claims, the Court will

enter summary judgment on those claims.

## I.   THE COURT WILL ENTER SUMMARY JUDGMENT ON JAMES'S EXCESSIVE FORCE CLAIMS ASSERTED UNDER A FOURTH AMENDMENT THEORY AGAINST CARTER, AS CARTER NEVER SEIZED MURPHY SR. OR M. MURPHY.

Qualified immunity shields government officials from liability where "their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person would

have known."  Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818).

When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the

plaintiff to meet a "heavy two-part burden."  Medina v. Cram, 252 F.3d at 1128.  The plaintiff must

demonstrate on the facts alleged: (i) that the defendant's actions violated his or her constitutional

or statutory rights; and (ii) that the right was clearly established at the time of the alleged unlawful

activity.  See Riggins v. Goodman, 572 F.3d at 1107.

Here, even when viewing the facts in the light most favorable to James, James has not established that a seizure of Murphy Sr. or M. Murphy occurred in violation of the Fourth Amendment. Consequently, the Court will enter summary judgment on her excessive force claims with respect to her Fourth Amendment theory against Carter.

### A.   NO SEIZURE OCCURRED WHEN CARTER FIRED HIS WEAPON AT MURPHY SR., AS MURPHY SR. WAS NOT HIT BY THE BULLET AND DID NOT SUBMIT TO A SHOW OF AUTHORITY.

An arrest constituting a seizure occurs when there is the exercise of a certain degree of physical force or submission to the assertion of authority. See California v. Hodari, 499 U.S. at 626. The Tenth Circuit has identified several factors that are relevant in determining whether a person has been seized within the meaning of the Fourth Amendment. They include:

> 1) The threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects; 6) a request to accompany the officer to the station; 7) interaction in a nonpublic place or a small, enclosed space; 8) and absence of other members of the public.

Jones v. Hunt, 410 F.3d at 1226 (internal quotation marks omitted). Additionally, "[v]iolation of the Fourth Amendment requires an intentional acquisition of physical control. A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful." Brower v. Cnty. of Inyo, 489 U.S. at 596 (1989).

When law enforcement officers exercise a certain degree of physical force against a person, that assertion of force will normally qualify as a seizure. "[A]pprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment." Tennessee v. Garner, 471 U.S. at 7. The Tenth Circuit has recognized that the use of a taser on a person, although not constituting deadly force, results in a seizure of the victim. See Cavanaugh v. Woods Cross

-40-

City, 625 F.3d at 665.  The Tenth Circuit assumed without deciding, that when a person in a vehicle

was shot with a firearm, but did not initially stop after the shot occurred, that a seizure had occurred.

 See Thomas v. Durastanti, 607 F.3d at 663 ("Even assuming without deciding Mr. Thomas can

meet the seizure element of his claim, however, he cannot show that it was unreasonable.").  The

Tenth Circuit noted that the plaintiff in that case's argument relied on dicta in the Supreme Court's

decision in California v. Hodari to the effect that "the 'application of physical force to restrain

movement, even when it is ultimately unsuccessful' is a seizure."  Thomas v. Durastanti, 607 F.3d

at 663.  On the other hand, when a police officer shot at a person piloting a helicopter, who had been

taken hostage at gunpoint and required to assist in the escape, and successfully hit the helicopter

once, the Tenth Circuit concluded that no seizure had occurred; the Tenth Circuit found that the

plaintiff had not submitted to the show of authority as he continued to flee once officers hit the

helicopter.  See Bella v. Chamberlain, 24 F.3d at 1256 ("The shots constituted an assertion of

authority, but they did not cause Mr. Bella to submit nor did they otherwise succeed in stopping him.

Indeed, Mr. Bella does not contend seriously that he was 'seized' prior to the time he was actually

arrested at the Albuquerque International Airport." (footnotes omitted)).  The Tenth Circuit did not

find it significant in its analysis that the plaintiff could not submit to the show of authority because

he was a hostage held at gunpoint.  See Bella v. Chamberlain, 24 F.3d at 1256 n.5.  The Tenth

Circuit also noted that, even if the officer's shot had accidently hit the plaintiff, it was not a foregone

conclusion that a Fourth Amendment seizure would have occurred based on the potential lack of

intent to cause a seizure.  See Bella v. Chamberlain, 24 F.3d at 1256 n.6.  The Tenth Circuit found

in Reeves v. Churchich that police pointing their weapons at and making verbal commands to the

plaintiffs did not constitute a seizure when the plaintiffs did not submit to the show of authority.  See

484 F.3d at 1252-53 ("[The officers] clearly asserted their police authority by pointing their weapons

and making verbal commands.  Nevertheless, in each situation, neither Ashlee nor Alicia submitted

to these assertions of authority.").  Addressing some disputed evidence whether the weapon touching

one of the plaintiff's faces when one of the officers held the gun at her head would change the result,

the Tenth Circuit reiterated that no seizure would occur until the plaintiff submitted to the officer's

show of authority.  See Reeves v. Churchich, 484 F.3d at 1253 ("In any event, even assuming Jones'

handgun touched Alicia's face, no seizure occurred because she failed to submit to this assertion of

authority.").  Noting that one of the plaintiffs was naked and might have reasonably ignored the

officers commands by running from the room and pushing the officer's gun from her head, the Tenth

Circuit emphasized that these facts would not affect the analysis, because courts must examine a

person's decision not to submit from an objectively reasonable standpoint instead of considering

their subjective intentions.  See Reeves v. Churchich, 484 F.3d at 1253.

The material facts regarding whether Carter seized Murphy Sr. are as follows.  Carter,

entered 1612 Spence SE and took a position in a west side, upstairs bedroom.  See Carter Interview

at 20:12-22:11.  1612 Spence SE is adjacent to and immediately east of 1608 Spence SE.  See Carter

Interview at 22:3-11.  From the second story window on the west side of 1612 Spence SE, Carter

could see directly into the second story bedroom of 1608 Spence SE.  See Carter Interview at 22:3-

11.  During the time that Carter was positioned at 1612 Spence SE, Carter was able to observe

Murphy Sr. and M. Murphy who were both located in M. Murphy's second story bedroom at 1608

Spence SE.  See M. Murphy Depo. at 123:24-124:14; Carter Interview at 25:3-9.  While Murphy

Sr. and M. Murphy were upstairs, Murphy Sr. asked M. Murphy to bring him a glass of water.  See

M. Murphy Depo. at 122:15-18.  To retrieve the glass of water, M. Murphy exited the bedroom and

proceeded down a hallway, which shared an adjoining wall with M. Murphy's room, and led to the

top of a staircase that descended to the first floor where the kitchen is located.  See M. Murphy

-42-

Depo. at 125:18-126:8.  As M. Murphy walked through the hallway, an interior wall concealed her from the view of Murphy Sr. and Carter.  See M. Murphy Depo. at 125:25-127:8.  Similarly, the interior wall prevented M. Murphy from seeing Murphy Sr. and Carter as she walked through the hallway.  See M. Murphy Depo. at 125:25-126:8.  Carter then fired one round from his rifle.  See Carter Interview at 32:17-33:1.  Carter aimed this shot at Murphy Sr.  See Carter Interview at 33:10-12.  This round did not strike Murphy Sr. or M. Murphy and did not cause them any physical injuries.  See MSJ ¶ 52, at 10 (setting forth this fact); Response at 2-3 (not disputing this fact).  Carter did not subsequently restrain, arrest, or imprison Murphy Sr.  See MSJ ¶ 53, at 10 (setting forth this fact); Response at 2-3 (not disputing this fact).  After Carter fired this first shot, he did not have any interaction with Murphy Sr.  See MSJ ¶ 54, at 10 (setting forth this fact); Response at 2-3 (not disputing this fact).  Carter contends that, at the time he decided to use deadly force and try to shoot Murphy Sr., Murphy Sr. was closing the distance in the upstairs bedroom towards M. Murphy, with the knife raised over his head.  See Carter Depo. #2 at 21:5-15, 23:6-14.  Carter believed that M. Murphy was still in the room and in the immediate vicinity of Murphy Sr. and the knife when he decided to use deadly force.  See Carter Depo. #2 at 23:6-14, 24:4-19.  Carter admits that he was not authorized to use deadly force if M. Murphy was not in the room at that time.  See Carter Depo. #2 at 24:4-19.

It is undisputed that Carter did not hit Murphy with his bullet.  There would be an issue whether a seizure in violation of the Fourth Amendment occurred if Carter had hit Murphy Sr. and killed him or had hit Murphy Sr. and he had either submitted to this show of authority or did not submit to this show of authority.  The undisputed facts indicate that Carter did not interact with Murphy Sr. after he fired this shot in a way that would indicate he further attempted to exercise physical force over Murphy Sr. or have Murphy Sr. submit to a show of authority.  James has also

pointed to no evidence suggesting that Murphy Sr. submitted to Carter's show of authority.  Once the movant meets his or her initial summary judgment burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  Given that the Tenth Circuit has not directly held that a seizure occurs even when an officer shoots a person who subsequently decides to not submit to that show of authority, the Court concludes that the Tenth Circuit would not find a seizure occurred in this case.  See Thomas v. Durastanti, 607 F.3d at 663. Carter shot at Murphy Sr., missed, and did not further interact with Murphy Sr.  See Thomas v. Durastanti, 607 F.3d at 663.  Furthermore, like the situation in Reeves v. Churchich, without evidence that a person has submitted to a show of authority, even an officer pointing a gun directly at a person's head does not constitute a seizure.  See Reeves v. Churchich, 484 F.3d at 1253 ("In any event, even assuming Jones' handgun touched Alicia's face, no seizure occurred because she failed to submit to this assertion of authority.").  The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d at 1241.  See Vitkus v. Beatrice Co., 11 F.3d at 1539 ("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)).

Likewise, the factors the Tenth Circuit has listed in Jones v. Hunt to determine whether a seizure has occurred would not be particularly helpful.[9]  James has never cited to any cases applying

---

[9]These eight factors include:

-44-

these factors or argued that any of these eight factors apply when a person does not submit to a show of authority.  Notably, one of the Tenth Circuit cases that applied these eight factors, Jones v. Hunt, involved a situation where officers took a teenager into an office and interrogated her for an "hour or two" and focused on whether she felt "free to leave," as opposed to a situation where officers try to seize a person through the exercise of physical force or a show of authority during or shortly after the commission of a crime.  Jones v. Hunt, 410 F.3d at 1226.  The cases applying these factors focus on whether a Terry stop transformed into an arrest, thus qualifying as a seizure.  See United States v. Hill, 199 F.3d 1143, 1147-48 (10th Cir. 1999)(addressing whether a police encounter transformed from a consensual encounter to an arrest).  Thus, the Court finds the cases that address the use of deadly force constituting a seizure and the cases regarding a show of submission to authority during or shortly after the commission of a crime more directly on point; these cases do not normally apply these eight factors.  James did not directly respond to this argument that no seizure occurred in her Response.   At the hearing, James argued that many of the Tenth Circuit cases to which the Defendants have cited are distinguishable, as they did not involve a seizure in a home.  First, James cited no authority at the hearing to support this argument.  Second, the relevant provisions of her Response in which James cites authority on this issue focus on whether the government's conduct is reasonable, not the issue of whether a seizure has occurred.  See Response at 7-8.  Third, some of the Tenth Circuit cases the Court has already discussed, such as Reeves v. Churchich, involved

---

    1) The threatening presence of several officers; 2) the brandishing of a weapon by an officer; 3) some physical touching by an officer; 4) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; 5) prolonged retention of a person's personal effects; 6) a request to accompany the officer to the station; 7) interaction in a nonpublic place or a small, enclosed space; 8) and absence of other members of the public.

Jones v. Hunt, 410 F.3d at 1226 (internal quotation marks omitted)

seizures in a home or a dwelling.  See 484 F.3d at 1249-50, 1253.  Fourth, even if a violation

occurred, James has not pointed to sufficient authority to demonstrate that the law is clearly

established on this issue for purposes of qualified immunity.  Consequently, the Court will enter

summary judgment on James' excessive force claim asserted on behalf of Murphy Sr. with respect

to his Fourth Amendment theory.

>    **B.    NO SEIZURE OCCURRED WHEN CARTER FIRED HIS WEAPON AND ALMOST HIT M. MURPHY BECAUSE CARTER DID NOT INTEND TO FIRE HIS WEAPON AT M. MURPHY.**

James contends that Carter seized M. Murphy when he fired the bullet that passed by her.

The Defendants counter that no seizure can occur without actual submission by the individual, and

that no facts indicate M. Murphy submitted to Carter's show of authority in firing the bullet.  See

MSJ at 19.  Furthermore, they argue that Carter did not intentionally or willfully attempt to seize M.

Murphy, which precludes the occurrence of a seizure under the Fourth Amendment.  See MSJ at 19.

"[W]hether a particular seizure is reasonable is dependent on the 'totality of the

circumstances.'"  Ryder v. City of Topeka, 814 F.2d at 1419 n.16.  An arrest constituting a seizure

occurs when there is the exercise of a certain degree of physical force or submission to the assertion

of authority.  See California v. Hodari, 499 U.S. at 626.  The Tenth Circuit has identified several

factors that are relevant in determining whether a person has been seized within the meaning of the

Fourth Amendment. They include:

> 1) The threatening presence of several officers; 2) the brandishing of a weapon by
> an officer; 3) some physical touching by an officer; 4) the use of aggressive language
> or tone of voice indicating that compliance with an officer's request is compulsory;
> 5) prolonged retention of a person's personal effects; 6) a request to accompany the
> officer to the station; 7) interaction in a nonpublic place or a small, enclosed space;
> 8) and absence of other members of the public.

Jones v. Hunt, 410 F.3d at 1226 (internal quotation marks omitted).  Additionally, "[v]iolation of

the Fourth Amendment requires an intentional acquisition of physical control.  A seizure occurs

even when an unintended person or thing is the object of the detention or taking, but the detention

or taking itself must be willful."  Brower v. Cnty. of Inyo, 489 U.S. at 596.

"[A]pprehension by the use of deadly force is a seizure subject to the reasonableness

requirement of the Fourth Amendment."  Tennessee v. Garner, 471 U.S. at 7.  "To determine the

constitutionality of a seizure '[courts] must balance the nature and quality of the intrusion on the

individual's Fourth Amendment interests against the importance of the governmental interests

alleged to justify the intrusion.'"  Tennessee v. Garner, 471 U.S. at 8.  The balance of these

competing interests is one of the key principles underlying the Fourth Amendment.  See Tennessee

v. Garner, 471 U.S. at 8.  "Because one of the factors is the extent of the intrusion, it is plain that

reasonableness depends on not only when a seizure is made, but also how it is carried out."

Tennessee v. Garner, 471 U.S. at 8.

The Tenth Circuit found in Childress v. City of Arapaho that no seizure occurred when

officers fired into a van at some fugitives, which resulted in the officers accidentally hitting two

hostages -- the plaintiffs -- in the vehicle.  See 210 F.3d at 1155-57.  The Tenth Circuit concluded

that no seizure occurred, because the officers accidentally, not intentionally, hit the plaintiffs, as the

officers intended to restrain the van and the fugitives rather than the hostages.  See Childress v. City

of Arapaho, 210 F.3d at 1157.  As the Tenth Circuit described:

> The police officers in the instant case did not "seize" plaintiffs within the meaning
> of the Fourth Amendment but rather made every effort to deliver them from unlawful
> abduction.  The officers intended to restrain the minivan and the fugitives, not Mrs.
> Childress and Caitlyn.  The injuries inflicted were the unfortunate but not
> unconstitutional "accidental effects of otherwise lawful conduct."  In keeping with
> our sister circuits, we hold that no Fourth Amendment seizure occurred in the instant
> case.

Childress v. City of Arapaho, 210 F.3d at 1157 (quoting Brower v. Cnty. of Inyo 489 U.S. at 596).

-47-

The Tenth Circuit reached this conclusion even though the police officers knew that the plaintiffs were in the van with the fugitives.  See Childress v. City of Arapaho, 210 F.3d at 1155-57.

The material facts for this claim are as follows.  Carter, entered 1612 Spence SE and took a position in a west side, upstairs bedroom.  See Carter Interview at 20:12-22:11.  1612 Spence SE is adjacent to and immediately east of 1608 Spence SE.  See Carter Interview at 22:3-11.  From the second story window on the west side of 1612 Spence SE, Carter could see directly into the second story bedroom of 1608 Spence SE.  See Carter Interview at 22:3-11.  During the time that Carter was positioned at 1612 Spence SE, Carter was able to observe Murphy Sr. and M. Murphy who were both located in M. Murphy's second story bedroom at 1608 Spence SE.  See M. Murphy Depo. at 123:24-124:14; Carter Interview at 25:3-9.  While Murphy Sr. and M. Murphy were upstairs, Murphy Sr. asked M. Murphy to bring him a glass of water.  See M. Murphy Depo. at 122:15-18.  To retrieve the glass of water, M. Murphy exited the bedroom and proceeded down a hallway, which shared an adjoining wall with M. Murphy's room, and led to the top of a staircase that descended to the first floor where the kitchen is located.  See M. Murphy Depo. at 125:18-126:8.  As M. Murphy walked through the hallway, an interior wall concealed her from the view of Murphy Sr. and Carter.  See M. Murphy Depo. at 125:25-127:8.  Similarly, the interior wall prevented M. Murphy from seeing Murphy Sr. and Carter as she walked through the hallway.  See M. Murphy Depo. at 125:25-126:8.  Carter then fired one round from his rifle.  See Carter Interview at 32:17-33:1.  Carter aimed this shot at Murphy Sr.  See Carter Interview at 33:10-12.  This round did not strike Murphy Sr. or M. Murphy and did not cause them any physical injuries.  See MSJ ¶ 52, at 10 (setting forth this fact); Response at 2-3 (not disputing this fact).  As M. Murphy walked through a hallway to the stairs, a bullet pierced through the wall and almost struck M. Murphy.  See M. Murphy Depo. at 126:18-127:7.  Although the trajectory of the bullet was close to M. Murphy,

Officer Carter's round did not strike M. Murphy or cause her any physical injuries.  See M. Murphy

Depo. at 131:2-7.  After the bullet struck another wall, M. Murphy ran downstairs and into the

kitchen of her house.  See M. Murphy Depo. at 131:8-16.  Carter did not intend this shot that he fired

at Murphy Sr. -- a shot that missed -- to almost strike M. Murphy.  See MSJ ¶ 59, at 11 (setting forth

this fact); Response at 2-3 (not disputing this fact).  Carter did not know nor should he have known

that the shot he fired at Murphy Sr. would almost strike M. Murphy.  See MSJ ¶ 60, at 11 (setting

forth this fact); Response at 2-3 (not disputing this fact).  Carter did not restrain, arrest, imprison,

or otherwise treat M. Murphy as if she was a suspect.  See MSJ ¶ 61, at 11 (setting forth this fact);

Response at 2-3 (not disputing this fact).  Carter did not fire his weapon with intent to harm M.

Murphy "or worsen her legal plight."  MSJ ¶ 62, at 11 (setting forth this fact); Response at 2-3 (not

disputing this fact).  After Carter fired this first shot, he did not have any interaction with M.

Murphy.  See MSJ ¶ 63, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).

Carter did not "intentionally seize[] or otherwise willfully acquire[] physical control over Mariah."

MSJ ¶ 64, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).

       The undisputed material facts are that Carter did not intentionally seize or otherwise willfully

acquire physical control over M. Murphy.  The key case on point on this issue is Childress v. City

of Arapaho.  The Tenth Circuit found in Childress v. City of Arapaho that no seizure occurred when

officers fired in a van at some fugitives, which resulted in the officers accidentally hitting two

hostages -- the plaintiffs -- in the vehicle.  See 210 F.3d at 1155-57.  The Tenth Circuit concluded

that no seizure occurred, because the officers accidentally, not intentionally, hit the plaintiffs, as the

officers intended to restrain the van and the fugitives rather than the hostages.  See Childress v. City

of Arapaho, 210 F.3d at 1157.   As the Tenth Circuit described:

       The police officers in the instant case did not "seize" plaintiffs within the meaning

of the Fourth Amendment but rather made every effort to deliver them from unlawful abduction.  The officers intended to restrain the minivan and the fugitives, not Mrs. Childress and Caitlyn.  The injuries inflicted were the unfortunate but not unconstitutional "accidental effects of otherwise lawful conduct."  In keeping with our sister circuits, we hold that no Fourth Amendment seizure occurred in the instant case.

Childress v. City of Arapaho, 210 F.3d at 1157 (quoting Brower v. Cnty. of Inyo 489 U.S. at 596).

The Tenth Circuit reached this conclusion even though the police officers knew that the plaintiffs were in the van with the fugitives.  See Childress v. City of Arapaho, 210 F.3d at 1155-57.  Here, unlike in Childress v. City of Arapaho, Carter did not hit M. Murphy.  That situation weighs against the occurrence of a seizure, because the impact of a bullet more strongly suggests a seizure.  Furthermore, much like this Tenth Circuit case, Carter did not intentionally or willfully attempt to seize M. Murphy.  "Violation of the Fourth Amendment requires an intentional acquisition of physical control.  A seizure occurs even when an unintended person or thing is the object of the detention or taking, but the detention or taking itself must be willful."  Brower v. Cnty. of Inyo, 489 U.S. at 596-97.  The Supreme Court has distinguished between the occurrence of an unintentional tort and a Fourth Amendment violation.  See Brower v. Cnty. of Inyo, 489 U.S. at 596.  James has not disputed that Carter did not act intentionally or willfully with respect to firing the bullet that passed by M. Murphy.  Consequently, even when viewing the facts in the light most favorable to James, the facts do not support a finding that a seizure occurred.

James did not directly respond to the argument that no seizure occurred in her Response.  At the hearing, James argued that many of the Tenth Circuit cases to which the Defendants have cited are distinguishable, as they did not involve a seizure in a home.  First, James cited no authority at the hearing to support this argument.  Second, the relevant provisions of her Response in which she cites authority on this issue focus on whether the government's conduct is reasonable, and not

-50-

on the issue whether a seizure has occurred.  See Response at 7-8.  Third, the Supreme Court and the Tenth Circuit have clearly articulated that a seizure must be intentional or willful, and have not qualified that analysis based on where that seizure occurs.  Furthermore, Childress v. City of Arapaho is directly on point, and James has not pointed to any controlling authority to the contrary. Fourth, even if a violation occurred, James has not pointed to sufficient authority to demonstrate that the law was clearly established on this issue for purposes of qualified immunity.  Consequently, the Court will enter summary judgment on James' excessive force claims asserted on behalf of M. Murphy with respect to the Fourth Amendment theory.

## II.   EXIGENT CIRCUMSTANCES WERE PRESENT, GIVING CARTER JUSTIFICATION TO ORDER THE SWAT TEAM TO ENTER THE HOME, AND CARTER'S CONDUCT WAS REASONABLE.

In her Response, James has raised a variety of allegations concerning the officers' "warrantless entry" into the Murphy home in violation of the Fourth Amendment based on the legitimate privacy interests that the family had in their home.  Response at 8-9.  The Defendants objected in their Reply to the inclusion of these allegations in the Response, arguing that James never asserted "illegal entry" claims in her Amended Complaint.  Reply at 8.  The Tenth Circuit interprets the inclusion of new allegations in a response to a motion for summary judgment as a potential request to amend the complaint.  See Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2003).  At the pre-trial conference on October 28, 2011, the parties agreed that the Court could these unlawful entry claims raised in the Response without requiring James to formally seek leave to amend her Amended Complaint.  See Oct. 28, 2011 Tr. at 8:20-10:2.  In this situation, the Tenth Circuit has recommended that a plaintiff should still formally amend his complaint.  See Martinez v. Potter, 347 F.3d at 1211 ("If an amendment is permitted, we think the federal rules contemplate a formal amended complaint, an amended answer and inclusion of the issue in the initial pretrial

report and the pretrial order."). Based on the agreement at the hearing, the Court will treat the allegations regarding unlawful entry claims in the Response as an unopposed motion seeking leave to amend the Amended Complaint. The Court will deny leave to amend, however, because amendment would be futile. The parties have also agreed that the Court can address these issues as part of the disposition of this Motion for Summary Judgment. Consequently, the Court will now address these unlawful entry claims.

James argues that the circumstances of this case did not justify a warrantless entry under the exigent-circumstances doctrine. See Response at 8. She asserts that a warrantless entry of a home is presumptively unconstitutional. See Response at 8. She contends that there was no immediate danger that justified Carter ordering the SWAT raid of the home. The Defendants point out that Carter never entered the home himself. The Defendants also argue that the circumstances of this case justified entrance into the home, as exigent circumstances existed based on the potential danger to M. Murphy as demonstrated by Murphy Sr.'s violent conduct.

In Brigham City, Utah v. Stuart, the Supreme Court recently addressed the existence of exigent circumstances in a factual situation similar to the one presented in this case. The Supreme Court found that exigent circumstances existed when police arrived at a loud party and heard a disturbance inside the home. See 547 U.S. at 400-01. The officers responded at three o'clock in the morning to complaints about a loud party. See id. at 401. As the officers approached the house, they could hear from inside the house some kind of altercation that was loud and tumultuous. See id. The officers heard thumping and crashing and people yelling "stop, stop" and "get off me." Id. The noise seemed to be coming from the back of the house. See id. The officers looked in the front window and saw nothing. See id. Afterwards, they proceeded to the back of the house and saw two juveniles drinking beer in the backyard. Id. From the back of the house, the officers could see a

fight taking place inside the house.  See id.  Several adults were holding back a juvenile.  See id. As the officers watched the fight, the juvenile broke free and struck one of the adults, sending the adult to the sink spitting blood.  See id.  The Supreme Court found these circumstances sufficient to justify a warrantless entry of the home.  See id. at 400, 406.  The Supreme Court also noted: "The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided."  Id. at 406.

In Michigan v. Fisher, 130 S.Ct. 546 (2009)(per curiam), the Supreme Court also found that exigent circumstances existed in a similar factual scenario to this case.  In Michigan v. Fisher, the Supreme Court likewise concluded that the police officers had exigent circumstances to enter the home under the "emergency aid exception."  130 S.Ct. at 548-49.  In that case, police officers responded to a dispute where neighbors had stated that the defendant was "going crazy."  Id. at 547. When the police officers arrived, they saw a pickup in the driveway with its front smashed, damaged fenceposts, three broken windows, glass still on the ground, and blood on the hood of the pickup and the clothes inside the pickup.  See id.  The officers could see the individual inside the house, screaming and throwing things.  See id.  The officers knocked on the door, but the defendant did not respond.  See id. at 548-49.  They saw that the defendant had cut his hand, and they asked whether he needed medical attention.  See id. at 547.  One officer ventured into the house, and the defendant pointed a gun at him.  See id. at 548-49.  The state courts suppressed the evidence obtained from the arrest that followed.  See id. at 547-48.  The Supreme Court reversed the decision, concluding that exigent circumstances existed.  See id. at 548.  Applying the rationale in Brigham City, Utah v. Stuart, the Supreme Court noted that the emergency aid exception applied, thus making the officer's entry into the home reasonable.  See Michigan v. Fisher, 130 S.Ct. at 548-49.  The Supreme Court

noted that the officers observed a tumultuous situation in the house when they arrived, and could

see violent behavior inside.  See id.  The Supreme Court also pointed out:

> Although Officer Goolsby and his partner did not see punches thrown, as did the
> officers in Brigham City, they did see Fisher screaming and throwing things.  It
> would be objectively reasonable to believe that Fisher's projectiles might have a
> human target (perhaps a spouse or a child), or that Fisher would hurt himself in the
> course of his rage.

See id.  Thus, the officers did not need to actually see violence targeted at an individual if "[i]t

would be objectively reasonable to believe that [an individual's conduct] might have a human target

(perhaps a spouse or a child)."  Id.

In United States v. Martinez, 643 F.3d 1292 (10th Cir. 2011), the Tenth Circuit concluded

that exigent circumstances did not exist to justify warrantless entry into the home.  In that case, the

911 call center received a 911 call from the defendant's residence.  See 643 F.3d at 1294.  The

dispatcher heard static on the line.  See id.  She tried to call the residence, but no one answered, and

she again only heard static on the line.  See id.  Several officers responded to the call.  See id.  One

of the officers knew that the call consisted only of static, and that phone-line problems or bad

weather can cause a static-only telephone call.  See id.  Other officers "within the department were

generally aware of this fact as well."  Id.  The house was in a rural area.  See id.  The officers

knocked on the front door, but received no response.  See id.  The officers saw no signs of forced

entry, and heard and saw no one inside.  See id. at 1295.  Through a sliding glass door, the officers

could see some electronic boxes near the door and noticed that the house looked disheveled.  See

id.  The officers opened the door and announced their presence, but received no response.  See id.

The officers searched the house to make sure no one was injured, unconscious, or deceased.  See id.

The officers seized incriminating evidence, and promptly left the house after they finished their

sweep of the house.  See id.  The Tenth Circuit concluded that exigent circumstances did not exist

based on the indeterminacy of the 911 call, as it was not a call where someone had called and then hung up, which would normally indicate a greater threat. See id. at 1296-97. The Tenth Circuit also noted that there was no indication anyone was in the house to corroborate the presence of a person in the home who needed assistance. See id. at 1297.

In an unpublished case, United States v. Belisle, 164 F.App'x 657 (10th Cir. 2005)(unpublished), the Tenth Circuit concluded that exigent circumstances existed to order the warrantless entry of a home. In that case, officers received a report of a disturbance involving a gun at an apartment complex. See United States v. Belisle, 164 F.App'x at 658. Two officers arrived to investigate. See id. One of the officers interviewed the resident who phoned the police. See id. The resident explained that her neighbor had asked to use the telephone; the neighbor was distraught, because "some people apparently inside of their apartment [were] causing trouble with her husband" and "there was some friends in his house." Id. The resident had agreed that she would retrieve the neighbor's child from the apartment. See id. The resident entered her neighbor's apartment, where she encountered the defendant on the couch, and the defendant pointed his gun at her. See id. at 658-59. The resident was frightened, but took the child and returned to her own apartment. See id. at 659. After this interview with the resident, the officers knocked on the neighbor's door. See id. They asked the defendant to step outside of the apartment, and the defendant complied. See id. The defendant was initially non-compliant with the officers' questions. See id. He responded negatively that there were guns, or other persons besides his daughter or wife, in the apartment. See id. He claimed that the resident who entered the neighbor's home had seen only a knife, and not a gun. See id. While one officer was speaking with the defendant, another officer entered the home through the front door, which was cracked open two to three inches. See id. The defendant's wife denied the existence of a gun, but using a ruse, the officer was able to get

her to admit where the gun was located.  See id.  The officers then received consent to look for other weapons, and then arrested the defendant for possession of a firearm based on his previous felony. See id. at 659-60.  The Tenth Circuit concluded that exigent circumstances justified entering the home.  See id. at 660-62.  The defendant tried to argue that there was no immediate danger.  See id. at 660-61.  The Tenth Circuit emphasized that a court should "examine the circumstances 'as they would have appeared to prudent, cautious, and trained officers.'"  See id. at 661.  The Tenth Circuit also noted: "While the exigent circumstances exception to the warrant requirement is narrow, and must be 'jealously and carefully drawn,' it does not require the officer to suspend common sense in light of the circumstances at hand.  Nor does it require us to compartmentalize the facts and look at them in isolation."  See id. (citations omitted).  The Tenth Circuit pointed out that there was sufficient evidence to lead a prudent officer to conclude that exigent circumstances justified entering the home based on the following facts: (i) that the officers knew, based on the resident's report, that an argument had occurred late at night in the neighbor's apartment that disturbed the neighbor enough for her to not reenter the apartment to retrieve her two-year-old daughter; (ii) that the officers knew that the resident had been confronted with a gun in the presence of a child; (iii) that the officers found the defendant's explanation unconvincing; and (iv) the officers' reason to believe that other dangerous individuals, at least one gun, and the defendant's wife and child were in the apartment.  See id.

        In Cortez v. McCauley, 478 F.3d 1108 (10th Cir. 2007), the Tenth Circuit concluded that exigent circumstances did not exist to justify a warrantless search of a home.  The police department received a call from a nurse at a hospital informing the police that a woman had brought in a child who complained that her babysitter's "boyfriend" had "hurt her pee pee."  478 F.3d at 1112-13.  The officers did not wait to receive the results of the medical exam.  See id. at 1113.  The officers did

not interview the child or her mother.  See id.  When the officers arrived at the home, the people inside were asleep.  See id.  The plaintiffs woke up once the officers arrived and inquired what was going on through a closed screen door.  See id.  The officers ordered them to leave the house.  See id.  After the officers arrested the plaintiffs, they performed a warrantless search of the home.  See id.  The Tenth Circuit concluded that the officers had "offered nothing, beyond innuendo and speculation, to establish objectively reasonable grounds of an emergency."  See id. at 1124.  The Tenth Circuit noted that the officers pointed to no specific facts that would lead them to believe the plaintiffs posed a threat to the officers or the others.  See id.  The Tenth Circuit noted that no evidence in the record suggested others were in the home.  See id.

The Tenth Circuit concluded in United States v. Martin, 613 F.3d 1295 (10th Cir. 2010), that exigent circumstances existed justifying the warrantless entry of a home.  In that case, officers received a call that someone had been shot in the chest.  See 613 F.3d at 1298.  People at the scene identified the shooter and said that he had fled on foot.  See id.  The officers obtained a photograph of the defendant's girlfriend.  See id.  The officers arrived at the girlfriend's home seeking to get a statement for her, roughly four hours after the shooting.  See id.  The officers could not get the attention of anyone in the apartment, but heard voices approaching the door.  See id.  The officers spoke with a man, the defendant, who approached the door, and he responded giving them the name the officers had earlier determined was the name of the suspect.  See id.  As the defendant said this, he began to step back further into the home.  See id.  The officers identified themselves as police, and told him to put his hands on his head and turn around.  See id.  The defendant did not do as told, and said he has something on him.  See id.  The officers were not able to see his hands and interpreted the statement as the defendant having a gun.  See id.  The officers then entered the home to arrest the defendant.  See id.  In concluding that exigent circumstances existed under the facts of

this case given the threat to the officers' safety, the Tenth Circuit noted:

> Where, as here, the circumstances giving rise to the claimed exigency occur not as a direct result of a long-planned arrest but "while the police are already out in the field investigating the prior or ongoing conduct which is the basis for the arrest," Professor LaFave has suggested, and we agree, "there should be a far greater reluctance to fault the police for not having a warrant. Here, the presumption should be in favor of a warrantless arrest rather than against it, as the probabilities are high that it is not feasible for the police to delay the arrest while one of their number leaves the area, finds a magistrate and obtains a warrant, and then returns with it."

Id. at 1305.

In Lundstrom v. Romero, 616 F.3d 1108 (10th Cir. 2010), the Tenth Circuit concluded that the officers did not have a reasonable belief that exigent circumstances existed. In that case, officers responded to a 911 call that someone was disciplining a child who was screaming. See 616 F.3d at 1115-16. The Tenth Circuit concluded that the officers had no reliable information that anyone else was in the house with the plaintiff. A neighbor told the officers that the information they had previously received regarding whether a child was in the home was not accurate and that the voice of the person screaming at the child was female voice. See id. at 1116-17. This neighbor stated that she was a retired police officer. See id. at 1117. The plaintiff was male. See id. at 1116-17. The plaintiff had denied any child was in the home. See id. at 1116-17. The Tenth Circuit concluded that the officers did not "have a reasonable basis for believing Lundstrom posed an immediate threat to them, himself, . . . or anyone else." Id. at 1124-25. The Tenth Circuit noted that it "might have reached a different conclusion if the record contained some indication of a child's presence." Id. at 1125. The child's voice that neighbors had overheard sounded like it was a toddler or younger. See id. at 1115.

Given the factually intensive inquiry whether exigent circumstances existed and whether an officer's conduct was reasonable under the Fourth Amendment, the Court considers virtually all of

-58-

the facts that the Defendants and James have presented to be material.  The Court notes that James has specifically controverted one of the Defendants' facts included in their Motion for Summary Judgment regarding why Murphy Sr. threatened or restrained his daughter from leaving the home. James successfully controverted that Murphy Sr. engaged in this conduct to harm or threaten M. Murphy.   While James has controverted that Murphy Sr. <u>intended</u> to threaten or restrain his daughter, she did not controvert that, "Murphy Sr. grabbed Mariah by her arm and pulled her back into the residence stating, 'You're not going anywhere,'" after she had "attempt[ed] to walk passed [sic] Murphy who was standing at the front door."  MSJ ¶ 30, at 7.  She also did not controvert that officers saw M. Murphy in the home and told him to "release Mariah."  MSJ ¶ 28, at 7.  She provided an additional material fact, however, that Murphy Sr. "never threatened Mariah while they were in the house together."  Response ¶ 19, at 6.  It is also undisputed that Murphy Sr.'s restraint of M. Murphy occurred after Murphy Sr. had waved the knife around in front of officers, acted in a threatening manner towards them, and thrown various items at the police officers.  James has also pointed to some testimony from Carter indicating that he had not discussed the specific crimes Murphy Sr. had committed with the other officers: "At the time Carter put himself in charge he knew that there had been some negotiations with the people in the house, but he didn't know who had conducted these, what progress had been made, or what had been said.  He didn't know what crimes, if any, had been committed."  Response ¶ 4, at 3.  It is undisputed that Carter knew Murphy Sr. was armed with a knife before he fired the shot or ordered the SWAT raid.  It is also undisputed that Carter was there at the scene with the other SWAT team members while the APD CNT members, who took over negotiations for the other officers, were negotiating with Murphy Sr.

James did not dispute a variety of other facts that the Defendants presented relating to Murphy Sr.'s conduct and other related facts regarding Carter's actions.  These facts include that:

(i) Murphy Sr. was standing outside of Bandera's door armed with a knife; (ii) Bandera feared for his safety as a result of Murphy Sr.'s conduct and called the APD for assistance; (iii) shortly afterwards, an officer saw Murphy Sr. driving around in a pickup waving his knife; (iv) an officer saw Murphy Sr. throw a beer bottle out of the vehicle while he was driving; (v) when Sanders arrived at Murphy Sr.'s home, he stepped out of the residence holding a twelve- to fourteen-inch knife; (vi) Murphy Sr. told the officers to release his son or someone would get hurt; (vii) Murphy Sr. acted in a threatening manner towards police officers, including yelling at them over a period of time; (viii) the officers knew a teenage girl, M. Murphy, was in the home; (ix) the officers told Murphy Sr. to release M. Murphy from the home and he did not comply; (x) various officers who negotiated with Murphy Sr. over a period of time were not able to defuse the situation; (xi) Murphy Sr. threw a beer bottle at one of the officers, which resulted in some glass striking the officer; (xii) Murphy Sr. threw his boom box radio at the officers, missing them; (xiii) Carter had spoken with the other officers about the situation; (xiv) Carter knew Murphy Sr. was armed with a knife, a dangerous weapon; (xv) Murphy refused to surrender the knife when requested to do so; (xvi) Carter knew Murphy Sr. had a knife before he shot at Murphy Sr.; and (xvii) Carter never hit Murphy Sr. or M. Murphy with a bullet.

Notably, the Supreme Court has recognized that, in determining the reasonableness of an officer's conduct under the Fourth Amendment, courts cannot consider whether the officer believed his conduct violated the Fourth Amendment.  See Brigham City, Utah v. Stuart, 547 U.S. at 404 ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" (alteration in original)).  Thus, it is irrelevant whether Carter believed exigent circumstances existed.  The Tenth Circuit has also recognized that courts cannot consider suspects' subjective intentions why they

acted the way they did in the context of Fourth Amendment analysis.  See Reeves v. Churchich, 484

F.3d at 1253 ("Thus, just as we objectively examine a police officer's conduct under the Fourth

Amendment, the Reeves' subjective motives behind their failure to submit are irrelevant." (citation

omitted)).  Thus, whether Murphy Sr. intended to threaten his daughter is irrelevant.  The police

officers could only observe Murphy Sr. restrain his daughter after she attempted to walk past him

and tell her that she was not going anywhere.  The Fourth Amendment analysis requires a court to

consider the facts that the officers observed from an on-scene perspective without considering these

subjective intentions.  See Saucier v. Katz, 533 U.S. at 205 ("Because 'police officers are often

forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly

evolving -- about the amount of force that is necessary in a particular situation,' the reasonableness

of the officer's belief . . . should be judged from that on-scene perspective.").  Whether Murphy Sr.

threatened her inside the home is relevant to the extent Carter might have observed Murphy Sr.

acting in a non-threatening manner towards M. Murphy.  It is also a relevant fact in determining

whether what Carter observed is reasonable.  The officers, however, would not be able to hear such

a threat or lack of a threat from outside the home.  See Saucier v. Katz, 533 U.S. at 205.

Exigent circumstances generally refers to the following circumstances: "imminent danger

of serious bodily harm, imminent danger of destruction of important property, response to an

emergency, or hot pursuit of a fleeing felon."  United States v. Gonzalez, 763 F.2d 1127, 1132 n.5

(10th Cir. 1985).  In emergency-aid situations, the Tenth Circuit employs a two-pronged test to

determine whether emergency circumstances justify a warrantless entry into a home, which

examines: "whether (1) the officers have an objectively reasonable basis to believe there is an

immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope

of the search is reasonable."  United States v. Najar, 451 F.3d at 717-18.  A court is "guided by the

realities of the situation presented by the record," and should consider the facts from the viewpoint of "prudent, cautious, and trained officers."  United States v. Porter, 594 F.3d 1251, 1258 (10th Cir. 2010)(citation omitted).  "Reasonable belief does not require absolute certainty; the standard is more lenient than the probable cause standard."  United States v. Porter, 594 F.3d at 1258 (citation omitted).  "Officers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception."  United States v. Porter, 594 F.3d at 1258 (citation omitted).  The Tenth Circuit has noted that guns and knives are both dangerous weapons.  See United States v. Holt, 264 F.3d 1215, 1223 (10th Cir. 2001)(en banc)(per curiam), abrogated on other grounds as stated in United States v. Stewart, 473 F.3d 1265, 1269 (10th Cir. 2007).

### A.   CARTER COULD REASONABLY DETERMINE THAT THERE WERE EXIGENT CIRCUMSTANCES BASED ON HIS OBSERVATIONS.

The Court concludes that Carter had exigent circumstances when he ordered the SWAT raid. Carter could reasonably determine that exigent circumstances existed based on his own observations.  In United States v. Belisle, officers faced a similar factual scenario to the one present in this case.  In that case, officers received a report of a disturbance involving a gun at an apartment complex, and two officers arrived to investigate.   See 164 F.App'x at 658.  One of the officers learned from the resident who telephoned the police that a man inside her neighbor's home likely had a gun, which he had pointed at the resident when she went inside the home.  See id. at 658-59. There was also some indication that others inside the home might be in danger from some individuals who were visiting the home.  See id. at 658.  The resident had agreed that she would retrieve the neighbor's child from the apartment.  See id.  The officers spoke with the man who allegedly pointed the gun at the resident.  See id. at 659.  The man was initially non-compliant, and responded negatively that there were guns or other persons besides his daughter or wife in the

apartment.  See id.  He stated that the resident who entered the neighbor's home had seen only a

knife and not a gun.  See id.  While one officer was speaking with the defendant, the other officer

entered the home through the front door, which was cracked open two to three inches.  See id.  The

Tenth Circuit concluded that exigent circumstances justified entering the home.  See United States

v. Belisle, 164 F.App'x at 660-62.  The Tenth Circuit noted: "While the exigent circumstances

exception to the warrant requirement is narrow, and must be 'jealously and carefully drawn,' it does

not require the officer to suspend common sense in light of the circumstances at hand.  Nor does it

require us to compartmentalize the facts and look at them in isolation."  Id. at 661 (citations

omitted).  On the issue whether an immediate need to protect the safety of others exited, the Tenth

Circuit stated: "What the [officers] did know was that a risk to themselves and others still existed

if the apartment contained an armed man."  Id. at 662.

        The situation in United States v. Belisle is comparable to the facts of this case based on the

ongoing risk inside the home which Murphy Sr. posed.  It is undisputed that Carter knew Murphy

Sr. was still in the home with M. Murphy when he ordered the SWAT raid.  It is also undisputed that

he knew Murphy Sr. was armed with a knife.  While it is also undisputed that M. Murphy had just

walked out of the room before Carter ordered the SWAT raid, Murphy Sr. was still in the home

armed with this weapon within close proximity of M. Murphy -- the next room.  Carter would also

have had no knowledge of the home's interior -- which could impact how easily Murphy Sr. could

pursue M. Murphy -- or how far M. Murphy planned to go outside of the room.  No new facts

indicated to the officers that the level of threat had decreased in a material way.  Murphy Sr. had

acted in an unpredictable manner throughout the night.  While Carter may not have observed him

acting in a threatening manner towards M. Murphy at that moment, Carter knew he was armed with

a weapon and that negotiations with Murphy Sr. were unsuccessful.[10]  Much like the situation in
United States v. Belisle, Carter did not need actual knowledge that Murphy Sr. had a knife if he had
a reliable source for his information, such as other police officers.  See United States v. Belisle, 164
F.App'x at 661-62.    Examining the circumstances "as they would have appeared to prudent,
cautious, and trained officers," the Court cannot reasonably conclude that a prudent, cautions, and
trained officer would conclude that existence of an exigency had dissipated, or that one did not exist
when Carter ordered the SWAT raid.  See Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d
1065, 1071 (10th Cir. 2010).  "What [Carter] did know was that a risk to . . . others still existed" if
Murphy Sr. was still in the home with the knife.  United States v. Belisle, 164 F.App'x at 662.
"Reasonable belief" as to the existence of an immediate threat "does not require absolute certainty;
the standard is more lenient than the probable cause standard."  United States v. Porter, 594 F.3d at
1258 (citation omitted).  "Officers do not need ironclad proof of 'a likely serious, life-threatening'
injury to invoke the emergency aid exception."  United States v. Porter, 594 F.3d at 1258 (citation
omitted).  Given that the situation had continued to escalate throughout the encounter with Murphy
Sr., that he had threatened to injure "someone," that he restrained M. Murphy, and that he refused
to surrender his weapon, the Court cannot reasonably conclude that Carter did not have a reasonable
belief as to the existence of an immediate threat to M. Murphy.  Based on his unpredictable and

---

[10]James notes that Carter stated, at the time he attempted to shoot Murphy Sr., that Murphy
Sr. was closing the distance in the upstairs bedroom towards M. Murphy, with the knife raised over
his head.  A court cannot resolve credibility disputes when deciding a motion for summary
judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  The Court will view the facts in
the light most favorable to James, that M. Murphy had walked outside of the room just before Carter
fired the shot and then ordered the SWAT raid, as a greater exigency would be present if Murphy
Sr. had in fact approached M. Murphy with a knife raised over his head.  Thus, because the most
favorable view of the facts is that M. Murphy was outside the room when Carter fired the shot and
then ordered the SWAT raid, the Court does not need to determine whether Carter's view of the
facts was accurate and could not do so as this would constitute deciding an issue of credibility.

aggressive conduct throughout the night, Murphy Sr. posed a threat as long as he had a knife in his possession and M. Murphy was in the home -- absent some other intervening facts or lengthy delay.

The facts of this case are also analogous to the Supreme Court's Michigan v. Fisher decision. In that case, police officers responded to a dispute where neighbors had stated that the defendant was "going crazy." 130 S.Ct. at 547. Likewise, the officers in this case responded to similar allegations regarding Murphy Sr. standing in front of Bandera's door with a knife. In Michigan v. Fisher, when the police officers arrived, they saw a pickup in the driveway with its front smashed, damaged fenceposts, three broken windows, glass still on the ground, and blood on the hood of the pickup and the clothes inside the pickup. See 130 S.Ct. at 547. In this case, when Carter and the other SWAT members arrived, negotiations with Murphy Sr. to calm down, release M. Murphy, and surrender the knife continued and remained unsuccessful. In Michigan v. Fisher, the officers could see the individual creating the disturbance inside the house, screaming and throwing things. See 130 S.Ct. at 547. Here, the officers observed Murphy Sr. brandishing a weapon and restraining his daughter from leaving the home. Carter knew that Murphy Sr. was armed with a knife and that M. Murphy was in the home with Murphy Sr. after they had retreated to the upstairs bedroom. Following a knock on the door to which the defendant did not respond, the officers in Michigan v. Fisher saw that the defendant had cut his hand and asked whether he needed medical attention. See 130 S.Ct. at 547. Those facts convinced the Supreme Court that officers could enter the defendant's home without a warrant, even before the defendant then pointed a gun at them after they entered the home. In this case, officers observed Murphy Sr. restrain his daughter once she attempted to leave and could not successfully convince him to release her. Calling Michigan v. Fisher "[a] straightforward application of the emergency aid exception," the Supreme Court concluded that exigent circumstances existed to justify warrantless entry of the home. Michigan v. Fisher, 130 S.Ct. at 548-

49.  In particular, the Supreme Court noted:

> Although Officer Goolsby and his partner did not see punches thrown, as did the officers in <u>Brigham City</u>, they did see Fisher screaming and throwing things.  It would be objectively reasonable to believe that Fisher's projectiles might have a human target (perhaps a spouse or a child), or that Fisher would hurt himself in the course of his rage.  In short, we find it as plain here as we did in <u>Brigham City</u> that the officer's entry was reasonable under the Fourth Amendment.

<u>Michigan v. Fisher</u>, 130 S.Ct. at 548-49.  Unlike <u>Michigan v. Fisher</u>, officers in this case, including Carter, observed a specific individual in the home to whom Murphy Sr. posed a threat, M. Murphy.  Additionally, Carter knew based on his communications with other officers that Murphy Sr. was armed with a large knife, while the officers in <u>Michigan v. Fisher</u> did not observe the weapon until after they entered the home, instead observing various projectiles which the defendant threw inside the home.  Given that the Supreme Court found the factual pattern in <u>Michigan v. Fisher</u> to be a "straightforward application of the emergency aid exception" and that it was "plain . . . that the officer's entry was reasonable under the Fourth Amendment," the Court cannot reasonably conclude that exigent circumstances did not exist under the facts of this case.  <u>Michigan v. Fisher</u>, 130 S.Ct. at 548-49.  It was reasonable for Carter to order the entry of the home without a warrant to give aid to M. Murphy and also potentially Murphy Sr., who had acted in an erratic manner throughout the night.  Viewing the situation from Carter's perspective without considering Murphy Sr.'s or M. Murphy's subjective thoughts, Carter and the officers faced a serious situation.  Negotiations with Murphy Sr. were unsuccessful, and he had threatened harm to various people.  Carter could have reasonably concluded that Murphy Sr. posed an immediate threat of harm to M. Murphy.  Murphy Sr. had retreated into the home with M. Murphy where the officers could no longer negotiate with Murphy Sr. or convince him to release M. Murphy.  Murphy Sr. continued to wield the knife.  Based on his unpredictable and aggressive conduct throughout the night, Murphy Sr. posed a threat as long

-66-

as he had the knife in his possession and M. Murphy was in the home -- absent some other intervening facts or lengthy delay.

While it is true that M. Murphy was Murphy Sr.'s daughter, the Supreme Court in Michigan v. Fisher also addressed where the potential target of the defendant's violence was "a spouse or a child." 130 S.Ct. at 548-49. Several cases in which the Tenth Circuit found exigent circumstances existed justifying warrantless entry into a home similarly involved a risk to the suspect's family members. See Lundstrom v. Romero, 616 F.3d at 1124-25 (noting that exigent circumstances did not exist but mentioning that conclusion might have been different if record contained some indication of a child's presence in the home who was reportedly one of the plaintiffs' daughters); Silvan W. v. Briggs, 309 F.App'x 216, 222 (10th Cir. 2009)(unpublished)(noting that state officials may remove a child from his or her home without predeprivation notice and hearing when exigent circumstances exist); United States v. Belisle, 164 F.App'x at 661 (risk posed to the defendant's wife and child in the home). Drawing all reasonable inferences in James' favor, the Court cannot reasonably conclude that M. Murphy being Murphy Sr.'s daughter affects the existence of an exigency given the surrounding circumstances "as they would have appeared to prudent, cautious, and trained officers" reacting to a potential domestic violence situation. Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d 1065, 1071 (10th Cir. 2010). Even in the context of a summary judgment motion that involves a qualified immunity defense, courts must evaluate the circumstances giving rise to the potential exigency "as they would have appeared to prudent, cautious, and trained officers." Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d at 1067-68, 1071.

While a warrantless search is presumptively unreasonable, other presumptions can arise. Specifically, the Tenth Circuit recently noted:

Where, as here, the circumstances giving rise to the claimed exigency occur

-67-

not as a direct result of a long-planned arrest but "while the police are already out in the field investigating the prior or ongoing conduct which is the basis for the arrest," Professor LaFave has suggested, and we agree, "there should be a far greater reluctance to fault the police for not having a warrant. Here, the presumption should be in favor of a warrantless arrest rather than against it, as the probabilities are high that it is not feasible for the police to delay the arrest while one of their number leaves the area, finds a magistrate and obtains a warrant, and then returns with it."

United States v. Martin, 613 F.3d at 1305. That case involved the warrantless entry of a dwelling.

See United States v. Martin, 613 F.3d at 1299-1305. This presumption that officers would not need to obtain a warrant arises in the situation presented in this case. Officers were responding to a call that Murphy Sr. had threatened Bandera. They received no information regarding any threats to any children, M. Murphy in this case. Murphy Sr. had driven to his home after officers had seen him on the street acting erratically. Officers secured his son as a possible witness. Murphy Sr. then told the officers to release his son or that someone would get hurt. Murphy Sr. refused to drop the knife. After Murphy Sr. had engaged in some threatening conduct, officers observed M. Murphy in the home. She attempted to leave the home until Murphy Sr. restrained her. Murphy Sr. remained in the home armed with the knife and alone with M. Murphy. Carter knew that Murphy Sr. still had the knife, that Murphy Sr. was in the home with M. Murphy, and that negotiations with Murphy Sr. were unsuccessful. These facts gave rise to the claimed exigency that arose at the scene. None of the undisputed facts suggest that this situation was "a direct result of a long-planned arrest," but instead suggest that it arose "while the police [were] already out in the field investigating the prior or ongoing conduct which is the basis for the arrest." United States v. Martin, 613 F.3d at 1305.

Furthermore, the exigency did not dissipate because the officers attempted to resolve the situation without entering the home at the moment Murphy Sr. restrained M. Murphy. The Supreme Court has recognized that, under some circumstances, too long of a period of time passing can undercut the officers' claim of exigency, although those situations normally involve alleged hot

pursuit of a defendant.  See Steagald v. United States, 451 U.S. 204, 221-22 (1981)(holding no

exigent circumstances where, upon learning that a federal fugitive might be staying at a house in

Atlanta, Georgia, federal agents waited two days before searching the house without a warrant);

G.M. Leasing Corp. v. United States, 429 U.S. 338, 358–59 (1977)(upholding district court's

implicit finding that there were no exigent circumstances, where agents delayed the challenged

search for two days following their first entry onto the premises and for one day following the

observation that materials were being removed from the premises).  The Tenth Circuit has found that

a delay of "at least a day" undercut the argument that exigent circumstances existed in one case.  See

United States v. Wicks, 995 F.2d 964, 980-81 (10th Cir. 1993).  None of those cases, however, dealt

with the emergency-aid exception under the exigent-circumstances doctrine.  As the United States

Court of Appeals for the Second Circuit has noted: "[E]ven if the agents might have been able to

obtain a warrant earlier in the day, their failure to do so at the first opportunity does not bar them

from acting on an exigency that arises later."  United States v. Gordils, 982 F.2d 64, 70 (2d Cir.

1992).  The United States Court of Appeals for the Ninth Circuit has also found that a "one hour

delay" did not "preclude[] a finding of exigency," particularly when viewing "the circumstances

known to the police prior to the warrantless action."  United States v. Lindsey, 877 F.2d 777, 781-82

(9th Cir. 1989)(emphasis in original).  Furthermore, courts have been more flexible with respect to

timing issues when exigent circumstances arise in a potential hostage situations, in other words,

situations where police reasonably believe that a person will not allow others to leave a location, and

that he or she poses a threat or has made threats to harm them.  See Ewolski v. City of Brunswick,

287 F.3d 492, 502-503 (6th Cir. 2002)(recognizing that exigent circumstances existed when a man

held his family members hostage in their home).[11]  In Ewolski v. City of Brunswick, that the police had been in a "two-day standoff" with a person holding his family members hostage did not persuade the Sixth Circuit that exigent circumstances did not exist in the hostage situation in that case.  287 F.3d at 502-03, 508.  In that case, at least sixteen hours passed between when the chief of police requested a mental evaluation of the individual in the house from a psychologist, which he believed to be necessary after officers could not resolve the situation, and when the chief of police ordered an armored vehicle to drive through the garage door of the home.  See 287 F.3d at 499-500.  The Sixth Circuit upheld the district court's grant of summary judgment on qualified immunity grounds with respect to its exigent circumstances determination.  See Ewolski v. City of Brunswick, 287 F.3d at 502-05.

Here a presumption arose that the officers did not need to obtain a warrant to enter the home, as the exigency arose at the scene.  See United States v. Martin, 613 F.3d at 1305.  As a general matter, a presumption shifts the burden of production to the opposing party to produce evidence to rebut the presumption.  See Pippin v. Burlington Resources Oil & Gas Co., 440 F.3d 1186, 1200 (10th Cir. 2006).  Similarly, in the context of summary judgment, once the movant meets their burden, rule 56(e) requires the non-moving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex Corp. v. Catrett, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. at 256.  James has pointed to no evidence indicating that the APD engaged in any delay.  In fact, many of James' additional material facts suggest that Carter acted too quickly rather than engaging in any delay, as he decided to "pick up the ball and run with it," and told Hedrick his

---

[11]The United States Court of Appeals for the Sixth Circuit noted that a hostage situation can still exist regardless whether "the suspect was making substantive demands in connection with such a threat."  Ewolski v. City of Brunswick, 287 F.3d at 502 n.2.

plan regarding getting a view of Murphy Sr. from a nearby location rather than taking orders from Hedrick. Response ¶ 3, at 3. While the Court must indulge all reasonable inferences in favor of the non-movant, the non-movant still has an obligation to produce evidence once the burden shifts to him or her. This was a potential hostage situation, as police officers had a reasonable belief that Murphy Sr. would not release M. Murphy from the home and posed an immediate threat to her. Given the sensitivity of dealing with a potential hostage situation that is ongoing, and taking into account the reasonableness of police officers' actions from the on-scene perspective, a court should not penalize officers for trying to defuse the situation peaceably instead of entering the home without a warrant as soon as the exigency arises. See Saucier v. Katz, 533 U.S. at 205 ("[T]he reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective."); Ewolski v. City of Brunswick, 287 F.3d at 499-500, 502-504, 508 (recognizing that a delay of at least sixteen hours during a two-day standoff did not undercut exigent circumstances in an ongoing hostage situation). Here, even drawing all reasonable inferences in James' favor, the Court cannot conclude that the facts permit a reasonable inference that more than several hours passed during the situation at the Murphy home, let alone sixteen hours. Roughly twenty minutes passed between the initial 911 call and APD officers calling in the SWAT team. No other facts permit a reasonable inference that more than sixteen hours passed.

Furthermore, many of the cases in which the Tenth Circuit has found exigent circumstances did not exist are factually distinguishable. In Lundstrom v. Romero, officers responded to a 911 call that someone was disciplining a child who was screaming. See 616 F.3d at 1115-16. The Tenth Circuit concluded that the officers had no reliable information that anyone else was in the house with the plaintiff. A neighbor told the officers that the information they had previously received regarding whether a child was in the home was not accurate and that the voice of the person

-71-

screaming at the child was female voice.  See id. at 1116-17.  This neighbor stated that she was a retired police officer.  See id. at 1117.  The plaintiff was male.  See id. at 1116-17.  The plaintiff had denied any child was in the home.  See id.  The Tenth Circuit concluded that the officers did not "have a reasonable basis for believing Lundstrom posed an immediate threat to them, himself, . . . or anyone else."  Id. at 1124-25.  The Tenth Circuit noted that it "might have reached a different conclusion if the record contained some indication of a child's presence."  Id. at 1125.  The child's voice that neighbors had overheard sounded like it was a toddler or younger.  See id. at 1115.  Here, police officers had observed Murphy Sr. brandish a knife, which he attempted to use against Bandera and had waved at the officers.  They had also observed him throw projectiles at them, including a beer bottle.  He had made threats to harm someone if his son was not returned.  He restrained his daughter and prevented her from leaving the home.  Carter knew that Murphy Sr. still had the knife, that Murphy Sr. was in the home with M. Murphy, and that negotiations with Murphy Sr. were unsuccessful.  These facts are unlike the situation in Lundstrom v. Romero, where the police lacked reliable information about who was in the house and had no firsthand observations that a threat existed to any person in conjunction with no indication that the suspect was engaging in any wrongful behavior.  Here, there was also reliable information that a young person was at risk in the home.  In Brigham City, Utah v. Stuart, the adults in that case were potentially harming juveniles, some of whom were drinking alcohol, when the officers entered the home.  See 547 U.S. at 405-06.  The Supreme Court found exigent circumstances justified the warrantless entry of the home in that case.  Thus, that M. Murphy was not a small child does not undercut the existence of an exigency.  Additionally, viewing the circumstances "as they would have appeared to prudent, cautious, and trained officers," the officers did not know M. Murphy's precise age, other than that she was a teenager.  Armijo ex rel. Armijo Sanchez v. Peterson, 601 F.3d at 1071.  Furthermore, an immediate

threat to a spouse -- who would in the significant majority of cases be older than a teenager -- can justify a warrantless entry of the home under the emergency aid exception of the exigent-circumstances doctrine.  See Michigan v. Fisher, 130 S.Ct. at 548-49 ("It would be objectively reasonable to believe that Fisher's projectiles might have a human target (perhaps a spouse or a child) . . . ."); United States v. Belisle, 164 F.App'x at 661 (exigent circumstances existed based on risk posed to the defendant's wife and child in the home).  Thus, even viewing these facts in the light most favorable to James, M. Murphy's age does not undercut the exigency.

Additionally, the situation in the Tenth Circuit case Cortez v. McCauley, where exigent circumstances did not exist, is distinguishable from the facts of this case.  In that case, the police department received a call from a nurse at a hospital advising that a woman had brought in a child who complained that her babysitter's "boyfriend" had "hurt her pee pee."  478 F.3d at 1112-13.  The officers did not wait to receive the results of the medical examination.  See id. at 1113.  The officers did not interview the child or her mother.  See id.  When the officers arrived at the home, the people inside were asleep.  See id.  The plaintiffs woke up and inquired what was happening through a closed screen door.  See id.  The officers ordered them to leave the house.  See id.  After the officers arrested the plaintiffs, they performed a warrantless search of the home.  See id.  The Tenth Circuit concluded that the officers had "offered nothing, beyond innuendo and speculation, to establish objectively reasonable grounds of an emergency."  Id. at 1124.  Unlike that case, the officers here had a variety of corroborating circumstances to indicate that Murphy Sr. could harm someone, including their own personal observations.  They arrived in the area because he was standing outside a neighbor's door with a knife, and the neighbor called 911.  When the officers arrived, he threatened to harm them or someone else.  He brandished a knife at them.  He would not allow his daughter to leave.  Officers attempted to negotiate with him, but he refused to calm down and

relinquish the knife.  Carter knew that Murphy Sr. still had the knife, that Murphy Sr. was in the home with M. Murphy, and that negotiations with Murphy Sr. were unsuccessful.  She had just left the room with him when Carter ordered the SWAT raid.  These facts are closer to the cases where the Supreme Court and the Tenth Circuit have concluded that exigent circumstances exist.

**B.      UNDER THE COLLECTIVE-KNOWLEDGE DOCTRINE, CARTER COULD REASONABLY DETERMINE THAT EXIGENT CIRCUMSTANCES EXISTED BASED ON THE OTHER OFFICERS' KNOWLEDGE THAT EXIGENT CIRCUMSTANCES EXISTED.**

Furthermore, the other officers' knowledge regarding Murphy Sr's conduct can be imputed to Carter under the collective-knowledge doctrine.  Under the collective-knowledge doctrine -- also called the "fellow officer rule" -- the knowledge of one officer supporting a search or seizure may be imputed to other law enforcement officers acting in conjunction with the knowledgeable officer. See United States v. Hensley, 469 U.S. 221, 232-33 (1985); United States v. Wilkinson, 633 F.3d 938, 941 (10th Cir. 2008). The collective-knowledge doctrine "can be conceptualized using two categories: 'horizontal' collective knowledge and 'vertical' collective knowledge." United States v. Chavez, 534 F.3d 1338, 1345 (10th Cir. 2008).  "The first category subsumes situations where a number of individual law enforcement officers have pieces of the probable cause puzzle, but no single officer possesses information sufficient for probable cause." United States v. Chavez, 534 F.3d at 1345 (citing  United States v. Shareef, 100 F.3d 1491, 1503-05 (10th Cir. 1996)).  In these situations, a court "must consider whether the individual officers have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable cause threshold." United States v. Chavez, 534 F.3d at 1345 (citations omitted); United States v. Christy, No. 10–1534, 2011 WL 3933868, at *39 (D.N.M. Sept. 2, 2011)(Browning, J.). The second category subsumes situations "where one officer has probable cause and instructs

another officer to act, but does not communicate the corpus of information known to the first officer that would justify the action." United States v. Chavez, 534 F.3d at 1345 (emphasis in original). In these situations, the relevant inquiry is whether the officer who requested that other law enforcement officer to conduct a search or make a seizure had a sufficient legal basis to make the request. See United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2008). The first and second categories are not mutually exclusive; for example, "the officer who has probable cause may possess that information as a result of communication from other officers." United States v. Chavez, 534 F.3d at 1345 n.12. While the collective-knowledge doctrine is most commonly applied to impute reasonable suspicion or probable cause to other officers, see, e.g., United States v. Chavez, 534 F.3d at 1345-46, several courts and judges, however, have stated or suggested that it also can be used to impute knowledge of exigent circumstances, see, e.g., United States v. Russell, 436 F.3d 1086, 1094-95 (9th Cir. 2006)(Thomas, J., concurring in part and dissenting in part)("We analyze the 'reasonable grounds to believe that there is an emergency at hand,' on an objective basis, taking into consideration the collective knowledge of the officers at the time." (citing United States v. Sutton, 794 F.2d 1415, 1426 (9th Cir. 1986))); Anthony v. City of New York, 339 F.3d 129, 137 (2d Cir. 2003); United States v. Christy, 2011 WL 3933868, at *40.

The Court will take into account this collective-knowledge rule in its exigent circumstances analysis. Although the parties have not directed the Court's attention to, and the Court has not found, cases which discuss whether the collective-knowledge doctrine can be used to impute knowledge of exigent circumstances, the only authority which the Court has found has suggested that the collective-knowledge doctrine can be used. See United States v. Russell, 436 F.3d at 1094-95; Anthony v. City of New York, 339 F.3d at 137; United States v. Pelletier, No. 05-09-P-S, 2005 WL 1800084, at *12 n.17 (D. Me. July 27, 2005). Additionally, the Court has applied this doctrine

in the context of exigent circumstances in a prior case.  See United States v. Christy, 2011 WL 3933868, at *40-47.  Application of the collective-knowledge doctrine to impute knowledge of exigent circumstances is consistent with the Supreme Court's holding in United States v. Hensley. In United States v. Hensley, the Supreme Court held: "[I]f a flyer or bulletin has been issued on the basis of articulable facts supporting a reasonable suspicion that the wanted person has committed an offense, then reliance on that flyer or bulletin justifies a stop to check identification . . . ."  469 U.S. at 232.  The Supreme Court recognized that "effective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information."  United States v. Hensley, 469 U.S. at 231 (citation omitted).  It stated that "[t]he law enforcement interests promoted by allowing one department to make investigatory stops based upon another department's bulletins or flyers are considerable, while the intrusion on personal security is minimal."  United States v. Hensley, 469 U.S. at 232.  Although the intrusion on personal security may be more than minimal in cases involving alleged exigent circumstances, police must act swiftly, especially in cases involving exigent circumstances, and effective law enforcement may require police officers to act on information transmitted from other officers.  The Court thus finds that the collective-knowledge doctrine can be used to impute knowledge of exigent circumstances.  See United States v. Russell, 436 F.3d at 1094-95; Anthony v. City of New York, 339 F.3d at 137; United States v. Pelletier, 2005 WL 1800084, at *12 n.17.

Here, officers had tried to defuse the situation before entering the home without a warrant. Roughly twenty minutes had passed between the initial 911 call and the officers' call for SWAT team assistance.  They felt the situation had escalated to such a significant degree that it was

-76-

necessary to call in the SWAT team.  Officers initially arrived at the scene because they received

a call that Murphy Sr. was standing in front of Bandera's door with a knife.  Murphy Sr. had

engaged in a variety of threatening behavior, towards both officers and other individuals.  He had

thrown a beer bottle and a boom box at the officers, and refused to surrender his knife.  The officers

were not sure if Murphy Sr. would injure his daughter, and he had refused to release her when they

requested him to do so.  After he refused to release his daughter, officers called the SWAT team.

While Carter may have not known all of the specifics of Murphy Sr.'s conduct, other officers had

requested the SWAT team's assistance, because they did not believe they could adequately handle

the situation.  Carter was a member of this SWAT team.  Carter also knew Murphy Sr. was armed

with a knife.  Carter had a better viewpoint than most of the officers on the situation, as he had a

view of Murphy Sr. and M. Murphy in her bedroom.  Given that Murphy Sr. had engaged in a

variety of threatening behavior and erratic conduct, including telling the officers to shoot him and

threatening to hurt someone, and that the officers could not have known Murphy Sr.'s subjective

intentions, the officers were not sure what Murphy Sr. would do to M. Murphy.  The Tenth Circuit

has recognized that courts cannot consider suspects' subjective intentions why they acted the way

they did in the context of Fourth Amendment analysis.  See Reeves v. Churchich, 484 F.3d at 1253

("Thus, just as we objectively examine a police officer's conduct under the Fourth Amendment, the

Reeves' subjective motives behind their failure to submit are irrelevant." (citation omitted)).  Thus,

whether Murphy Sr. intended to threaten his daughter is irrelevant.  The police officers could only

observe him restrain his daughter after she attempted to walk past him and tell her that she was not

going anywhere.  The Fourth Amendment analysis requires a court to consider the facts that the

officers observed from an on-scene perspective without considering these subjective intentions.  See

Saucier v. Katz, 533 U.S. at 205 ("Because 'police officers are often forced to make split-second

judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of

force that is necessary in a particular situation,' the reasonableness of the officer's belief . . . should

be judged from that on-scene perspective.").

While it is true that a warrantless search is presumptively unreasonable, other presumptions

can arise.  Specifically, the Tenth Circuit recently noted:

> Where, as here, the circumstances giving rise to the claimed exigency occur
> not as a direct result of a long-planned arrest but "while the police are already out in
> the field investigating the prior or ongoing conduct which is the basis for the arrest,"
> Professor LaFave has suggested, and we agree, "there should be a far greater
> reluctance to fault the police for not having a warrant.  Here, the presumption should
> be in favor of a warrantless arrest rather than against it, as the probabilities are high
> that it is not feasible for the police to delay the arrest while one of their number
> leaves the area, finds a magistrate and obtains a warrant, and then returns with it."

United States v. Martin, 613 F.3d at 1305.  That case involved the warrantless entry of a dwelling.

See United States v. Martin, 613 F.3d at 1299-1305.  This presumption that officers would not need

to obtain a warrant arises in the situation presented in this case.  Officers were responding to a call

that Murphy Sr. had threatened Bandera.  They had receive no information regarding any threats to

any children, M. Murphy in this case.  Murphy Sr. had returned to his home after officers had seen

him on the street acting erratically.  Officers secured his son as a possible witness.  Murphy Sr. then

told the officers to release the son or that someone would get hurt.  Murphy Sr. refused to drop the

knife.  After Murphy Sr. had waved the knife at officers and thrown various items at them, including

a glass bottle and a boom box, officers observed M. Murphy in the home.  She attempted to leave

the home until Murphy Sr. restrained her.  This restraint is the claimed exigency that arose at the

scene.  None of the undisputed facts suggest that this situation was "a direct result of a long-planned

arrest," but suggest instead that it arose "while the police [were] already out in the field investigating

the prior or ongoing conduct which is the basis for the arrest."  United States v. Martin, 613 F.3d

at 1305.

An analysis of the applicable case law leads to the conclusion that exigent circumstances existed.  The facts of this case are most directly analogous to the Supreme Court's <u>Michigan v. Fisher</u> decision.  In that case, police officers responded to a dispute where neighbors had stated that the defendant was "going crazy."  130 S.Ct. at 547.  Likewise, the officers in this case responded to similar allegations regarding Murphy Sr. standing in front of Bandera's door with a knife.  In <u>Michigan v. Fisher</u>, when the police officers arrived, they saw a pickup in the driveway with its front smashed, damaged fenceposts, three broken windows, glass still on the ground, and blood on the hood of the pickup and the clothes inside the pickup.  <u>See</u> 130 S.Ct. at 547.  In this case, when police first observed Murphy Sr., he was driving around in his pickup, waving a knife out his window and throwing beer bottles to the ground.  In <u>Michigan v. Fisher</u>, the officers could see the individual creating the disturbance inside the house, screaming and throwing things.  <u>See</u> 130 S.Ct. at 547.  Here, the officers observed Murphy Sr. brandishing a weapon, received various threats from Murphy Sr., and had to avoid the projectiles he threw at them.  Following a knock on the door to which the defendant did not respond, the officers in <u>Michigan v. Fisher</u> saw that the defendant had cut his hand and asked whether he needed medical attention.  <u>See</u> 130 S.Ct. at 547.  Those facts convinced the Supreme Court that officers could enter the defendant's home without a warrant, even before the defendant then pointed a gun at them after they entered the home.  In this case, officers observed Murphy Sr. restrain his daughter once she attempted to leave and could not successfully convince him to release her.  Calling <u>Michigan v. Fisher</u> "[a] straightforward application of the emergency aid exception," the Supreme Court concluded that exigent circumstances existed to justify warrantless entry of the home.  <u>Michigan v. Fisher</u>, 130 S.Ct. at 548-49.  In particular, the Supreme Court noted:

> Although Officer Goolsby and his partner did not see punches thrown, as did the officers in <u>Brigham City</u>, they did see Fisher screaming and throwing things. It would be objectively reasonable to believe that Fisher's projectiles might have a human target (perhaps a spouse or a child), or that Fisher would hurt himself in the course of his rage. In short, we find it as plain here as we did in <u>Brigham City</u> that the officer's entry was reasonable under the Fourth Amendment.

<u>Michigan v. Fisher</u>, 130 S.Ct. at 548-49. Unlike <u>Michigan v. Fisher</u>, officers in this case observed a specific individual in the home to whom Murphy Sr. posed a threat, M. Murphy. Additionally, they observed a weapon, a twelve- to fourteen-inch knife, while the officers in <u>Michigan v. Fisher</u> did not observe the weapon until after they entered the home, instead observing various projectiles which the defendant threw inside the home. Given that the Supreme Court found the factual pattern in <u>Michigan v. Fisher</u> to be a "straightforward application of the emergency aid exception" and that it was "plain . . . that the officer's entry was reasonable under the Fourth Amendment," the Court cannot reasonably conclude that exigent circumstances did not exist under the facts of this case.

<u>Michigan v. Fisher</u>, 130 S.Ct. at 548-49. It was reasonable for officers to enter the house without a warrant to give aid to M. Murphy and also potentially Murphy Sr., who had acted in an erratic manner telling officers to shoot him and that he was going to hurt someone. Viewing the situation from the officer's perspective without considering Murphy Sr.'s or M. Murphy's subjective thoughts, the officers faced a serious situation. Negotiations with Murphy Sr. were unsuccessful, and he had threatened to harm both the officers and someone, which could have included M. Murphy. He restrained her from leaving, which she attempted to do at the police officer's requests. They then retreated into the home where the officers could no longer negotiate with Murphy Sr. or convince him to release M. Murphy. Murphy Sr. continued to wield the knife. As the Court has previously determined, that M. Murphy was Murphy Sr.'s daughter or that she was a teenager would not undercut the exigency under these circumstances.

Carter can rely on the other officers' knowledge and observations for the purposes of establishing exigent circumstances.  It is not disputed that Carter was at the scene with the other SWAT members while the APD CNT were negotiating with Murphy Sr.  As the Court has concluded, the officers at the scene, including Holloway, Sanders, Trujillo, and Molander, had exigent circumstances based on the immediate threat to M. Murphy.  Molander called in the SWAT team for assistance.  This situation is a vertical knowledge situation under the collective-knowledge doctrine.  "[O]ne officer <u>has</u>" exigent circumstances "and instructs another officer to act, but does not communicate the corpus of information known to the first officer that would justify the action." <u>United States v. Chavez</u>, 534 F.3d at 1345 (emphasis in original).  In these situations, the relevant inquiry is whether the officer who requested that other law enforcement officer to conduct a search or make a seizure had a sufficient legal basis to make the request.  <u>See</u> <u>United States v. Rodriguez-Rodriguez</u>, 550 F.3d at 1227 ("When law enforcement officials rely on a bulletin or alert to conduct a stop or make an arrest, the relevant inquiry is whether the officer who issued the alert -- rather than the officer who conducted the challenged action -- had the requisite level of suspicion.").  That requirement is met here, as the officers at the scene who called in the SWAT team had a reasonable basis to conclude that exigent circumstances existed under the emergency-aid exception.[12]  Likewise,

_____

[12]The Court does not address whether the officers who followed Carter's order had exigent circumstances to justify their conduct based on the application of the collective-knowledge doctrine, even if Carter did not have his own independent basis for concluding exigent circumstances existed. James has conceded that those officers had exigent circumstances based on the firing of the shot and Carter's order.  <u>See</u> Response at 10 ("Plaintiff concedes that the SWAT team members had no real choice but to respond to Carter's 'assault' command.").  The Court notes that it concludes that, even when viewing the facts in the light most favorable to James, Carter had exigent circumstances both based on his own observations and under the collective-knowledge doctrine.  Thus, based on Carter's own knowledge of the existence of exigent circumstances, the other SWAT team members would have exigent circumstances under the collective-knowledge doctrine.  Because the claims against some of the other SWAT team members are subject to separate summary judgment motions, the Court does not have sufficient facts before it to conclude whether the SWAT team members had

a presumption arose that the officers did not need to obtain a warrant because the exigency arose

when the officers arrived at the scene. James has offered no evidence to rebut that presumption.

### C.   VIEWING THE FACTS IN THE LIGHT MOST FAVORABLE TO JAMES, EXIGENT CIRCUMSTANCES EXISTED AND CARTER'S CONDUCT IN ORDERING THE SWAT RAID WAS REASONABLE.

Even taking all the facts in the light most favorable to James and drawing all reasonable

inferences in her favor, there is no genuine issue of material fact whether an exigency existed.

James has not rebutted the presumption that the officers did not need to obtain a warrant based on

the exigency arising at the scene, such as pointing to evidence indicating that they engaged in any

significant delay. Likewise, M. Murphy exiting the room did not diminish the threat Murphy Sr.

posed given his erratic and aggressive behavior, as he still had the knife in his possession. She was

still in the adjacent room, and Carter would have had no knowledge of the layout inside the home

or where M. Murphy planned to go in the home. Carter only needed a reasonable belief that Murphy

Sr. posed an immediate threat to M. Murphy, which the circumstances viewed from an objectively

reasonable standpoint of an officer in Carter's position supported.

None of the authority to which James points undercuts the Court's conclusion. The most

similar case regarding exigent circumstances to which James cites is factually distinguishable. In

that case, the police tried to argue that exigent circumstances existed based on accusations that the

plaintiff had engaged in unpredictable and dangerous behavior, general knowledge that he had

access to a handgun and had threatened to kill his former wife and her family, and that he could have

potentially escaped to carry out this threat against them. See Garrison v. City of Cushing, 5 F.3d

545, 1993 WL 332284, at *4-5 (10th Cir. 1993)(unpublished table decision). Unlike this case, the

their own basis to conclude that exigent circumstances existed.

family was at a different location than where the police found the plaintiff.  See id. at *1-2.  The

Tenth Circuit concluded that there was no immediate threat to the lives of the police officers or

others.  See id. at *5.  The Tenth Circuit relied on the family being at a different location in reaching

its conclusion, and those facts are not present in this case.  In Garrison v. City of Cushing, the

plaintiff had committed the crime several days before and was in hiding, which undercut the

officers' argument that there was an exigency.  See id. at *1, 5.  Unlike the facts in Garrison v. City

of Cushing, there was an immediate threat of danger to M. Murphy from Carter's perspective, which

qualified as exigent circumstances to order the SWAT team to enter the home.  Other cases to which

James cites do not convince the Court that exigent circumstances did not exist here.  See United

States v. Gay, 240 F.3d at 1228-29 (recognizing that exigent circumstances existed justifying entry

into home when the arresting officers had information from several informants that the defendant

carried a weapon at all times, currently dealt drugs, and recently participated in a shootout with

police); Valdez v. McPheters, 172 F.3d at 1224-28 (not addressing existence of exigent

circumstances); United States v. Aquino, 836 F.2d at 1273-74 (10th Cir. 1988)(recognizing that

exigent circumstances exist based on a sale of illegal drugs when the police have reason to believe

the defendant will destroy the criminal evidence).

With respect to the issue of the reasonableness of Carter's conduct, James also contends that

Carter improperly decided to take a commanding role and order the SWAT team to enter the home.

James cites no authority that indicates this conduct would violate Murphy Sr.'s Fourth Amendment

rights.  The Tenth Circuit has recognized that "no violation of a constitutional right aris[es] from the

decision to deploy [a] SWAT team" when a plaintiff does not present evidence that the person

ordering the SWAT raid knew that the SWAT team would use excessive force, knew that the SWAT

team members intended to cause harm to any person, or that the person who ordered the SWAT

team told the SWAT team members to use excessive force. Holland ex. rel. Overdorff v. Harrington, 268 F.3d at 1191. The Tenth Circuit also noted that "[t]he specific conduct of the SWAT deputies during" the raid at issue in the case was "another matter," but concluded that the district court erred in not entering summary judgment on qualified immunity grounds with respect to the officers that ordered the use of the SWAT team. Holland ex. rel. Overdorff v. Harrington, 268 F.3d at 1191. Here, James has not pointed to any evidence indicating that Carter knew that the SWAT team would use excessive force, that he knew that they intended to cause harm to any person, or that he ordered the SWAT team to use excessive force. See Holland ex. rel. Overdorff v. Harrington, 268 F.3d at 1191. Thus, even when viewing the facts in the light most favorable to James, the argument that Carter's decision to order the SWAT raid violated Murphy Sr.'s and M. Murphy's Fourth Amendment rights is unpersuasive. James bears the burden to present such evidence to establish a constitutional violation, although Carter bears the burden to present evidence regarding the existence of an exigency. Consequently, the Court concludes that no Fourth Amendment violation occurred, as Carter had exigent circumstances to authorize the warrantless entry of the home and he acted reasonably in doing so.[13]

_____

[13]The Supreme Court recently concluded that, when police "create the exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment," police may not rely on the exigent-circumstances doctrine to enter a home without a warrant to prevent the destruction of evidence. Kentucky v. King, 131 S.Ct. 1849, 1858 (2011). A threat to violate the Fourth Amendment occurs "where the police, without a warrant or any legally sound basis for a warrantless entry, threaten that they will enter without permission unless admitted." Kentucky v. King, 131 S.Ct. at 1858 n.4. As the Court has concluded, exigent circumstances existed, and Carter did not otherwise engage in any conduct that violated the Fourth Amendment. No seizure occurred when he fired the shot at Murphy Sr. and when the shot passed by M. Murphy. Furthermore, his conduct in ordering the SWAT raid was reasonable. Thus, this exception to the exigent-circumstances doctrine discussed in Kentucky v. King would not apply to the facts of this case. See Kentucky v. King, 131 S.Ct. at 1858.

**D.   ASSUMING EXIGENT CIRCUMSTANCES DID NOT EXIST, THE LAW REGARDING SUCH A CONSTITUTIONAL VIOLATION WAS NOT CLEARLY ESTABLISHED.**

Even if Carter's conduct violated the Fourth Amendment, the law regarding such a violation was not clearly established.  The plaintiff in a qualified immunity case has the burden to establish that a right is clearly established.  See Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186. A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be "indisputable" and "unquestioned."  Zweibon v. Mitchell, 720 F.2d at 172-173.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Strepka v. Miller, 28 F.App'x at 829-30.  See Medina v. City and Cnty. of Denver, 960 F.2d at 1498.  "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1186 (quoting Anderson v. Creighton, 483 U.S. at 640).  The Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful."  Anderson v. Creighton, 483 U.S. at 640.  However, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. at 635.  This rule protects officers in that they "can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution."  Saucier v. Katz, 533 U.S. at 205.  Qualified immunity operates "to protect officers

-85-

from the sometimes 'hazy border between excessive and acceptable force,' and to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." Saucier v. Katz, 533 U.S. at 205. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S. at 639. The Tenth Circuit has adopted a sliding scale to determine when law is clearly established: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007).

Even if the Court were to conclude that ordering the entry of the SWAT raid was unconstitutional based on the lack of exigent circumstances, the Court does not conclude that the law regarding this violation was clearly established. As the Supreme Court articulated in Saucier v. Katz, qualified immunity still applies when an officer has "reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example." Saucier v. Katz, 533 U.S. at 206 (emphasis added). The Supreme Court has recognized that some inquiries must "accommodate limitless factual circumstances" and thus it may be difficult to predict how a court will apply a test under a particular set of facts. Saucier v. Katz, 533 U.S. at 205. If an officer's mistake regarding the application of the law to a set of factual circumstances viewed from the officer's perspective is reasonable, qualified immunity still applies. See Saucier v. Katz, 533 U.S. at 205. The incident in this case occurred on June 5, 2007. By that time, the Supreme Court had issued its Brigham City, Utah v. Stuart opinion and the Tenth Circuit had issued its United States v. Najar opinion. Brigham City, Utah v. Stuart dealt with a comparable factual scenario to the one in this case and applied the emergency aid exception. The Supreme Court concluded in that case that the facts presented to the officers authorized warrantless entry into a home after the police

observed an altercation in a home through a back window.  Additionally, that opinion emphasized: "The role of a peace officer <u>includes preventing violence and restoring order</u>, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided."  <u>See</u> <u>Brigham City, Utah v. Stuart</u>, 547 U.S. at 406 (emphasis added).  Likewise, in <u>United States v. Najar</u>, the Tenth Circuit recognized that, based on the <u>Brigham City, Utah v. Stuart</u> decision, a police officer must have only a reasonable belief as to the immediate threat of harm to an individual to justify the invocation of this emergency aid exception.  <u>See</u> <u>United States v. Najar</u>, 451 F.3d at 718.  Both of those decisions indicate a relatively flexible standard for officers to enter a home without a warrant in the face of an immediate threat to someone's safety.  Furthermore, in <u>Brigham City, Utah v. Stuart</u>, the adults in that case were potentially harming juveniles, some of whom were drinking alcohol, when the officers entered the home.  That factual scenario is like the situation in this case where there was a potential risk to a teenager.  The officers observed Murphy Sr. restrain M. Murphy and prevent her from leaving the home.  While some of the facts regarding how much knowledge Carter had regarding Murphy Sr.'s conduct are disputed, it is undisputed that Carter was at the scene with the other SWAT team members while the APD CNT members, who took over negotiations for the other officers, were negotiating with Murphy Sr.  It is also undisputed that Carter knew Murphy Sr. was armed with a knife in the home.  In <u>United States v. Najar</u>, the officers did not specifically see the defendant engaging in any threatening behavior, either inside the home or outside the home.  Instead, they had knowledge that several 911 calls had come from the house.  In this case, the officers also arrived at the scene because of a 911 call from Bandera.  Unlike <u>United States v. Najar</u>, the officers saw Murphy Sr. armed with a weapon and engaging in threatening behavior towards them and M. Murphy.  The officers could not have known Murphy Sr.'s subjective intentions that he did not wish to harm M. Murphy.  <u>See</u> <u>Reeves v.</u>

Churchich, 484 F.3d at 1253.  What they could see was his act of restraining M. Murphy and telling her not to leave.

If M. Murphy walking out of the room before Carter ordered the SWAT raid would be a basis for concluding that no exigent circumstances existed based on the lack of immediate threat to M. Murphy and potential delay by the officers, the law regarding such a violation was not clearly established.  The Supreme Court has emphasized that courts must take into account the officers' on-scene perspective in gauging the reasonableness of their conduct and the reasonableness of their mistake as to the application of the exigent-circumstances doctrine.  See Saucier v. Katz, 533 U.S. at 205.  Additionally, James bears the burden on the issue whether a right is clearly established.  Given the factually intensive inquiry of when an immediate threat of injury exists, the fact that M. Murphy had just left the room before Carter ordered the SWAT raid is a subtle distinction given many of the other facts present in this case.   Much of Murphy Sr.'s conduct that night suggested he posed a serious threat. More importantly, James has pointed to no authority drawing such a distinction.  The same rationale applies to the issue of any delay on the part of the officers.  The Sixth Circuit has indicated that even a sixteen-hour delay in the context of a hostage situation where a man held his family members hostage did not undercut the existence of exigent circumstances. See Ewolski v. City of Brunswick, 287 F.3d at 502-05.  Supreme Court case law has emphasized that courts must be conscious of the need for officers to adapt to a developing situation on the ground, because "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving."  Graham v. Connor, 490 U.S. at 397.  Under the Tenth Circuit's sliding scale to determine when law is clearly established: "The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  Casey v. City of Fed. Heights, 509 F.3d at

-88-

1284.  Here, there is little indication that any constitutional violation Carter committed would be egregious.  James has pointed to only one case that is factually similar to the current situation.  That case involved a delay of several days and involved the officers traveling to several different locations over that period of time because they could not find the plaintiff.  See Garrison v. City of Cushing, 1993 WL 332284, at *1-2, 4-5.  Furthermore, the family who the officers believed was at risk was at a completely different location than the plaintiff, thus undercutting any exigency.  See Garrison v. City of Cushing, 1993 WL 332284, at *4-5.  It is undisputed that all of the events in this case took place within one day while officers remained at Murphy Sr.'s home.  That case is not sufficiently analogous to put Carter on fair notice that exigent circumstances would not exist in this case given that his violation was not egregious.  See Casey v. City of Fed. Heights, 509 F.3d at 1284.

A general test, such as the exigent circumstances test, must apply to "limitless factual circumstances," making it difficult to predict how a court will apply a test under a particular set of facts.  Saucier v. Katz, 533 U.S. at 205.  While it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful," Anderson v. Creighton, 483 U.S. at 640, an officer can still rely on a qualified immunity defense if he makes a "reasonable, but mistaken, belief[] as to the facts establishing the existence of . . . exigent circumstances, for example," Saucier v. Katz, 533 U.S. at 206.  Courts cannot consider "at a high level of generality" whether the law was clearly established, but must look for "clear law (clear answers) that would apply to the situation at hand."  Mascorro v. Billings, 656 F.3d 1198, 1208 (10th Cir. 2011).  This is particularly true when the violation was not egregious under the Tenth Circuit's sliding scale approach.  James points to general case law regarding the presumption that a warrantless entry into a home is unconstitutional and that deal with exigent circumstances in factually distinct contexts.  See United States v. Gay, 240 F.3d at 1228-29 (recognizing that exigent circumstances existed

justifying entry into home when the arresting officers had information from several informants that the defendant carried a weapon at all times, currently dealt drugs, and recently participated in a shootout with police); <u>Valdez v. McPheters</u>, 172 F.3d at 1224-28 (not addressing existence of exigent circumstances); <u>United States v. Aquino</u>, 836 F.2d at 1273-74 (10th Cir. 1988)(recognizing that exigent circumstances exist based on a sale of illegal drugs when the police have reason to believe the defendant will destroy the criminal evidence). The Court cannot consider "at a high level of generality" whether the law was clearly established, but must look for "clear law (clear answers) that would apply to the situation at hand." <u>Mascorro v. Billings</u>, 656 F.3d at 1208. James has not met her burden to demonstrate that the law was clearly established regarding any mistake Carter made as to the existence of exigent circumstances. Thus, the Court concludes that the law establishing that Carter violated Murphy Sr. and M. Murphy's Fourth Amendment rights was not clearly established.

**III.   THE COURT WILL ENTER SUMMARY JUDGMENT ON JAMES' EXCESSIVE FORCE CLAIMS WITH RESPECT TO HER SUBSTANTIVE DUE-PROCESS THEORY AGAINST CARTER, AS THERE IS NO GENUINE ISSUE OF MATERIAL FACT WHETHER A CONSTITUTIONAL VIOLATION OCCURRED AND THE LAW REGARDING ANY SUCH VIOLATION WAS NOT CLEARLY ESTABLISHED.**

James has alleged that Carter's conduct violated Murphy Sr.'s and M. Murphy's Fourteenth Amendment substantive due-process rights. <u>See</u> Amended Complaint ¶ 84, at 18-19.[14] The

---

[14]The parties have not directly addressed the effect of the Supreme Court's holding in <u>Graham v. Connor</u> on James' excessive force claims, which rely in part on substantive due-process theories. The Supreme Court in that case held that courts should analyze all claims of excessive force in the context of an arrest or detention under the Fourth Amendment's reasonableness standard as opposed to a substantive due-process standard. <u>See</u> <u>Graham v. Connor</u>, 490 U.S. at 395. Specifically, the Supreme Court said:

> Today we make explicit what was implicit in <u>Garner</u>'s analysis, and hold that <u>all</u> claims that law enforcement officers have used excessive force -- deadly or not -- in

Defendants argue that, because Carter took his actions to stop Murphy Sr.'s dangerous actions, Carter's decision to fire a round does not shock the conscience. See MSJ at 21. The Defendants point out that, at the time Carter took action, he knew that Murphy Sr. had committed the following crimes: (i) "the inherently violent crime of aggravated assault against Arturo Bandera"; and (ii) "the violent crime of false imprisonment against Mariah." MSJ at 21. The Defendants assert that Murphy fired the round to protect M. Murphy from Murphy Sr. "who was an armed and dangerous felon." MSJ at 21. With respect to M. Murphy, the Defendants point out that there is no evidence that shows that Carter: (i) fired his weapon at M. Murphy; (ii) intended the single round that he fired at Murphy Sr. to also strike M. Murphy; (iii) knew or should have known that the single round that he fired at Murphy Sr. would also strike M. Murphy; and (iv) intended the singled round that he fired at Murphy Sr. to cause physical or emotional harm to M. Murphy. See MSJ at 21-22. James

--------

the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach.

Graham v. Connor, 490 U.S. at 395 (emphasis in original). The Supreme Court has later clarified that this holding "simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." United States v. Lanier, 520 U.S. 259, 272 n.7 (1997). More specifically, the Supreme Court has concluded that, if a search or seizure did not occur, the Fourth Amendment does not cover the situation, and the plaintiff may proceed on a substantive due-process theory. See Cnty. of Sacramento v. Lewis, 523 U.S. at 842-844 ("The Fourth Amendment covers only 'searches and seizures,' neither of which took place here. . . . Graham's more-specific-provision rule is therefore no bar to respondents' suit."). The Court has concluded that, when Carter fired a shot at Murphy Sr., no seizure occurred. The Court has also concluded that Carter did not seize M. Murphy when he missed her with his bullet. Thus, James may proceed on a substantive due-process theory regarding Carter firing a shot at Murphy Sr. and M. Murphy as the Fourth Amendment does not apply to those situations. See Cnty. of Sacramento v. Lewis, 523 U.S. at 842-844. The Court has to address, however, whether the Fourth Amendment authorized Carter to order the SWAT team to enter the home without a warrant. Thus, because the Fourth Amendment jurisprudence applies to that situation, James may not proceed on a substantive due-process theory regarding that conduct. See Cnty. of Sacramento v. Lewis, 523 U.S. at 842-844.

argues that Carter's conduct in using deadly force against Murphy Sr. in the absence of exigent circumstances shocks the conscience.  See Response at 11-12.  James points out that Carter admitted that he could not legally try to shoot Murphy Sr. if M. Murphy was not in the same room, facing an imminent threat of death or serious bodily injury.  See Response at 11.  James also points out that Carter admitted that he could not legally order a warrantless SWAT team entry and assault into the Murphy home unless the same exigent circumstances were present.  See Response at 11-12.  James contends that there are a variety of inconsistencies in the other officers' testimony regarding where M. Murphy was located as Carter fired the shot at Murphy Sr.  See Response at 12.

"The touchstone of due process is protection of the individual against arbitrary action of government . . . whether the fault lies in a denial of fundamental procedural fairness . . . or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective."  Graves v. Thomas, 450 F.3d at 1220 (quoting Cnty. of Sacramento v. Lewis, 523 U.S. at 845-46).  The ultimate measure of whether conduct by state actors violates due process is whether "the challenged government action 'shocks the conscience' of federal judges."  Ruiz v. McDonnell, 299 F.3d at 1183 (quoting Uhlrig v. Harder, 64 F.3d at 573).  To succeed on a substantive due-process claim, a "plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 574).  More specifically, "a § 1983 violation based on substantive due process 'must be predicated on a state action manifesting one of two traditional forms of wrongful intent -- that is, either (1) an intent to harm; or (2) an intent to place a person unreasonably at risk of harm."  Ward v. Anderson, 494 F.3d at 938 (quoting Uhlrig v. Harder, 64 F.3d at 573).  In determining whether a defendant's actions shock the conscience, three principles guide the Court's analysis: (i) the need for restraint in defining the scope of substantive due process;

(ii) the recognition that 42 U.S.C. § 1983 should not be used to replace state tort law; and (iii) the propriety of deferring to local policymakers' decisions regarding public safety. See Valdez v. New Mexico, 109 F.App'x at 262; Ruiz v. McDonnell, 299 F.3d at 1184. Lastly, ordinary negligence does not shock the conscience, and even permitting unreasonable risks to continue is not necessarily conscience shocking. Rather, a plaintiff must demonstrate a degree of outrageousness, and a magnitude of potential or actual harm, that is truly conscience shocking. See Ruiz v. McDonnell, 299 F.3d at 1184.

With respect to excessive force claims, the Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397. Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205. When an officer moves for qualified immunity on an excessive force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)." Cortez v. McCauley, 478 F.3d at 1128.

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable. In Estate of Larsen v. Murr, the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors. These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260. In Weigel v. Broad, the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  A court should assess "objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case."  Estate of Larsen v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).

To avoid a "Monday morning quarterback" approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor.  The Fourth Amendment requires only that the defendant officers chose a "reasonable" method to end the threat that the plaintiff posed to the officers in a force situation, regardless of the availability of less intrusive alternatives.  Graham v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints, and stated that Brown v. Texas

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. at 647 ("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means.").  To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the

method chosen is reasonable.

With respect to the issue of deadly force, courts must consider the reasonableness of the use of deadly force from "the totality of the circumstances." Phillips v. James, 422 F.3d at 1083. "Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." Carr v. Castle, 337 F.3d at 1227 (quoting Tennesee v. Garner, 471 U.S. at 11). As the Tenth Circuit noted:

> Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

Carr v. Castle, 337 F.3d at 1227 (quoting Tennesee v. Garner, 471 U.S. at 11). On the other hand, "[w]here the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so . . . . A police officer may not seize an unarmed, nondangerous suspect by shooting him dead." Tennesee v. Garner, 471 U.S. at 11. The use of deadly force is justified under the Fourth Amendment "if a reasonable officer in the Defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." Phillips v. James, 422 F.3d at 1083. A court should also consider whether the officers were in danger at the moment that they used force and whether the officers' own reckless or deliberate conduct during the seizure unreasonably created the need to use such force. See Phillips v. James, 422 F.3d at 1083. Negligent acts that precipitate a confrontation, on the other hand, are not actionable. See Blossom v. Yarbrough, 429 F.3d at 968. A court may consider only events immediately connected with the seizure. See Blossom v. Yarbrough, 429 F.3d at 968. Depending on the context and the seriousness of the

violation in question, employing the assistance of a SWAT team can render a search unreasonable.

See Phillips v. James, 422 F.3d at 1082.

A.    CARTER'S USE OF DEADLY FORCE DID NOT VIOLATE MURPHY SR.'S SUBSTANTIVE DUE-PROCESS RIGHTS AND DID NOT VIOLATE CLEARLY ESTABLISHED LAW.

Given the factually intensive inquiry whether a substantive due-process violation occurred under the facts of a particular case, the Court considers virtually all of the facts the Defendants and James have presented to be material.  The Court notes that James specifically controverted one of the Defendants' facts included in their Motion for Summary Judgment regarding why Murphy Sr. threatened or restrained his daughter from leaving the home.  James successfully controverted that Murphy Sr. engaged in this conduct to harm or threaten M. Murphy, instead presenting evidence that he intended to act this way only out of fear for her safety.  James did not dispute that the officers observed Murphy Sr. threaten and restrain M. Murphy.  James has also pointed to some testimony from Carter indicating that he had not discussed the specific crimes Murphy Sr. had committed with the other officers.  James did not dispute, however, a variety of other facts that the Defendants presented relating to Murphy Sr.'s conduct and other related facts regarding Carter's actions.  These facts include that: (i) Murphy Sr. was standing outside Bandera's door armed with a knife; (ii) Bandera feared for his safety as a result of Murphy Sr.'s conduct and called the APD for assistance; (iii) shortly afterwards, an officer saw Murphy Sr. driving around in a pickup waving his knife; (iv) an officer saw Murphy Sr. throw a beer bottle out of the vehicle while he was driving; (v) Murphy Sr. yelled at the police officers; (vi) the officers knew a teenage girl, M. Murphy, was in the home; (vii) the officers repeatedly told Murphy Sr. to release M. Murphy from the home and he did not comply; (viii) various officers who negotiated with Murphy Sr. over a period of time were not able to defuse the situation; (ix) Murphy Sr. threw a beer bottle at one of the officers, which

resulted in some glass striking the officer; (x) Murphy Sr. threw his boom box radio at the officers, missing them; (xi) Carter spoke with the other officers about the situation, but did not know some of the specifics of the situation; (xii) Murphy Sr. was armed with a knife, a dangerous weapon; (xiii) Murphy refused to surrender the knife when requested to do so; (xiv) Carter knew Murphy Sr. had a knife before he shot at Murphy Sr.; and (xv) Carter never hit Murphy Sr. or M. Murphy with a bullet.

One of the most analogous Tenth Circuit cases that the Court has found is Latta v. Keryte, 118 F.3d 693 (10th Cir. 1997).  In that case, the officer received a dispatch that there was an intoxicated driver slumped over the steering wheel of a vehicle near the interstate.  See Latta v. Keryte, 118 F.3d at 695.  The officer was able to confirm this information through his observations, and also noticed the driver was looking at the officer in his rearview mirrors and then began fumbling with something underneath his seat.  See Latta v. Keryte, 118 F.3d at 695-96.  The officer approached the vehicle and noticed that the driver appeared to be unclean, and that his clothes were dirty and unkempt, which the officer concluded meant the driver had been on a drinking binge.  See Latta v. Keryte, 118 F.3d at 696.  The officer asked the driver if he was alright and asked him to get out of the car.  See Latta v. Keryte, 118 F.3d at 696.  The driver did not respond, and began to lock his doors and roll up his windows when approached from the other side of the vehicle.  See Latta v. Keryte, 118 F.3d at 696.  The driver asked for the officer's identification as a police officer.  See Latta v. Keryte, 118 F.3d at 696.  As the officer reached for his identification, the driver sped off, and the officer pursued him.  See Latta v. Keryte, 118 F.3d at 696.  The officer concluded that the driver was traveling at about fifty miles per hour in a sixty-five mile per hour zone.  See Latta v. Keryte, 118 F.3d at 696.  The officer tried to pass the vehicle, but the driver would swerve his vehicle to prevent the officer from passing.  See Latta v. Keryte, 118 F.3d at 696.  The officer

-97-

became concerned that the driver would try to leave the interstate and travel to a populated area where he might cause an accident.  See Latta v. Keryte, 118 F.3d at 696.  The officer attempted to stop the car twice by bumping it from behind.  See Latta v. Keryte, 118 F.3d at 696.  The officer contacted his supervisor to request permission to use other means to stop the driver and received permission to shoot out the tires.  See Latta v. Keryte, 118 F.3d at 696.  The officer then shot out the left rear tire and then shot out the left front tire after the driver had not slowed down.  See Latta v. Keryte, 118 F.3d at 696.  Other officers had set up a road block.  See Latta v. Keryte, 118 F.3d at 696.  The driver stopped about forty to fifty feet before the roadblock.  See Latta v. Keryte, 118 F.3d at 695.  The officers approached the vehicle with their weapons drawn, asking the driver to get out of the vehicle.  See Latta v. Keryte, 118 F.3d at 696.  The officers then had to forcibly remove the driver from the vehicle.  See Latta v. Keryte, 118 F.3d at 696.

The district court dismissed the driver's excessive force claims on summary judgment based on qualified immunity grounds.  See Latta v. Keryte, 118 F.3d at 695.  The Tenth Circuit affirmed the order granting summary judgment.  See Latta v. Keryte, 118 F.3d at 702.  In evaluating the driver's excessive force claims based on a substantive due-process theory, the Tenth Circuit found that, even though the officer had used potentially deadly force to stop the driver, the officer's conduct was reasonable in light of the circumstances, particularly given that the driver might injure himself or others.  See Latta v. Keryte, 118 F.3d at 702.  The Tenth Circuit also noted that the driver's injuries were minimal, as the officer's actions during the pursuit did not cause him any physical injury.  See Latta v. Keryte, 118 F.3d at 702.  The Tenth Circuit also pointed out that the record contained no indication that the officer acted with improper motive or malice, and rather that the driver had only argued that he acted with excessive zeal amounting to an abuse of official power that shocks the conscience.  See Latta v. Keryte, 118 F.3d at 702.

Here, much like in <u>Latta v. Keryte</u>, Carter's use of deadly force does not shock the conscience.  The use of deadly force is reasonable under the Fourth Amendment "if a reasonable officer in the Defendant's position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others."  <u>Phillips v. James</u>, 422 F.3d at 1083.  On the other hand, to succeed on a substantive due-process claim, a "plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking."  <u>Camuglia v. City of Albuquerque</u>, 448 F.3d at 1223.  Notably, it does not matter whether or not Carter actually believed he was authorized to use deadly force, as courts must evaluate a police officer's conduct objectively.  <u>See</u> <u>Brigham City, Utah v. Stuart</u>, 547 U.S. at 404 ("An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" (alteration in original)).  Based on Murphy Sr.'s refusal to comply with the officers' requests, including the release of M. Murphy, Carter's awareness that Murphy Sr. had engaged in some threatening and erratic behavior, and that a continuing threat existed, the Court concludes that Carter's use of deadly force does not shock the conscious.  Carter had sufficient facts before him to conclude that there was a threat of serious physical harm to M. Murphy.  While Murphy Sr. may have had no intention of harming M. Murphy, the Court cannot consider a suspect's subjective intentions in a Fourth Amendment analysis and must also evaluate Carter's conduct objectively from the perspective of a reasonable officer in Carter's position.  <u>See</u> <u>Reeves v. Churchich</u>, 484 F.3d at 1253.  Carter could not have known Murphy Sr.'s subjective intentions, and could only make his evaluations based on the facts of which he was aware.  <u>See</u> <u>Saucier v. Katz</u>, 533 U.S. at 205 ("[T]he reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective.").  In assessing the degree of threat facing officers, courts consider a number of non-exclusive factors.  These

-99-

include: (i) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (ii) whether any hostile motions were made with the weapon towards the officers; (iii) the distance separating the officers and the suspect; and (iv) the manifest intentions of the suspect.  See Mich. Dep't of State Police v. Sitz, 511 F.3d at 1260.  Here, Murphy Sr. had not complied with police commands to drop his weapons after the police had ordered him to do so.  Furthermore, he had thrown a beer bottle and a boom box at the officers, indicating that he did not intend to comply with their commands.  While Murphy Sr. had not tried to use the knife on the officers, he was waiving the knife around at various points.  While the other officers were not immediately near Murphy Sr. when Carter fired the shot, M. Murphy was in his general vicinity -- immediately outside the room.  Murphy Sr.'s conduct indicated that he might commit violence against M. Murphy and possibly others who came near him.  Courts should consider threats to the safety of not only officers but of others as well.  See Weigel v. Broad, 544 F.3d at 1151-52.  Likewise, courts should also consider the severity of the crimes at issue, which in this case included violent crimes and several more potential violent crimes that Murphy Sr. might commit with the knife.  See Weigel v. Broad, 544 F.3d at 1151-52.  Murphy Sr. was also actively resisting arrest throughout his encounter with the police.  See Weigel v. Broad, 544 F.3d at 1151-52.  While Carter may not have known the exact crimes Murphy Sr. committed, it is undisputed that he had some conversations with the other officers about the situation and was there when some of the negotiations with Murphy Sr. took place.

Furthermore, Carter's decision involved "the kind of instantaneous judgment call that is so often required of law enforcement personnel," as the situation could have at any moment escalated to a specific danger to M. Murphy or to the other officers.  Radecki v. Barela, 146 F.3d 1227, 1232 (10th Cir. 1998).  While there is a dispute over where exactly M. Murphy was when Carter fired the

shot based on testimony from some other officers who were in the home, James did not specifically controvert the Defendants' asserted material fact that M. Murphy had passed out of Carter's view when he fired the shot.  The parties do not dispute that M. Murphy had walked outside of the room before Carter fired the shot.  James also points to testimony from Carter that Murphy Sr. was approaching M. Murphy with the knife before Carter fired the shot.  Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. at 587.  Carter would have had even more grounds to use deadly force on Murphy Sr. if Murphy Sr. had been approaching M. Murphy with a knife, as she would be in imminent danger of death or serious injury.  Even viewing the facts in the light most favorable to James under both scenarios, where M. Murphy had passed out of view when Carter fired the shot or where Murphy Sr. was approaching M. Murphy with a knife and then Carter fired the shot, Carter's conduct would have still not resulted in a violation of Murphy Sr.'s substantive due-process rights under either scenario.  If Carter waited until M. Murphy passed out of view, those facts indicate that he did not want to hit M. Murphy with a bullet.  James does not dispute that Carter did not intend to hit M. Murphy.  Consequently, that conduct does not shock the conscience as it indicates Carter waited until M. Murphy left the room to avoid hurting her.  James points out that M. Murphy was leaving the room to get her father a glass of water and that Murphy Sr. was waiting for the glass of water when Carter shot him, which makes Carter's conduct conscience shocking.  See Response at 8.  That M. Murphy left the room to get a glass of water for her father is irrelevant, as Carter would have had no knowledge why she left the room.  On the other hand, if Carter waited until Murphy Sr. approached M. Murphy with a knife, those facts indicate that Carter fired the shot to protect M. Murphy and prevent him from stabbing her.

Furthermore, as the Tenth Circuit has indicated, a court should also consider whether the

plaintiff suffered any harm from the officer's conduct in evaluating a substantive due-process claim in the context of excessive force.  See Latta v. Keryte, 118 F.3d at 702 ("Second, the extent of Mr. Latta's injury was minimal. Mr. Latta admits that Officer's actions during the pursuit did not cause him any physical injury.  As we stated in Bella: '[W]e have never upheld an excessive force claim without some evidence of physical injury.'" (footnote omitted)(citations omitted)).  While officers did ultimately kill Murphy Sr., James has not presented any evidence that Carter firing the bullet at Murphy Sr. ever harmed him.

With respect to the argument that exigent circumstances did not exist to justify Carter ordering the SWAT team to enter the home, the Court has concluded that this claim implicates the Fourth Amendment.  Under Graham v. Connor and County of Sacramento v. Lewis, a plaintiff cannot state an excessive force claim against officers under a substantive due-process theory when that excessive force claim implicates the Fourth Amendment.  See Cnty. of Sacramento v. Lewis, 523 U.S. at 842-844; Graham v. Connor, 490 U.S. at 395.  The Court concluded earlier that this unlawful entry claim relating to Carter's decision to authorize a warrantless SWAT team entry into the Murphy home implicated the Fourth Amendment.  Consequently, James may not rely on a substantive due-process theory to assert an excessive force claim against Carter based on this conduct.  See Cnty. of Sacramento v. Lewis, 523 U.S. at 842-844; Graham v. Connor, 490 U.S. at 395.  Furthermore, the Court concluded that this conduct did not violate the Fourth Amendment.

James has not demonstrated a degree of outrageousness, and a magnitude of potential or actual harm, that is conscience shocking.  See Ruiz v. McDonnell, 299 F.3d at 1184.  James has pointed to no authority that supports her position that under the facts of this case a substantive due-process violation occurred with respect to Murphy Sr.  Likewise, assuming such a violation did occur, James points to no authority indicating that Carter's conduct violated clearly established law.

-102-

**B.     CARTER'S USE OF DEADLY FORCE WAS NOT IN VIOLATION OF M. MURPHY'S SUBSTANTIVE DUE-PROCESS RIGHTS AND DID NOT VIOLATE CLEARLY ESTABLISHED LAW.**

James has alleged that Carter's conduct violated M. Murphy's Fourteenth Amendment substantive due-process rights.  See Amended Complaint ¶ 84, at 18-19.  With respect to M. Murphy, the Defendants point out that there is no evidence that shows that Carter: (i) fired his weapon at M. Murphy; (ii) intended the single round that he fired at Murphy Sr. to also strike M. Murphy; (iii) knew or should have known that the single round that he fired at Murphy Sr. would also strike M. Murphy; and (iv) intended the single round that he fired at Murphy Sr. to cause physical or emotional harm to M. Murphy.  See MSJ at 21-22.  James did not specifically respond to the argument regarding M. Murphy in her Response.  James argues that Carter's conduct in using deadly force against Murphy Sr. in the absence of exigent circumstances shocks the conscience.  See Response at 11-12.  She points out that Carter admitted that he could not legally try to shoot Murphy Sr. if M. Murphy was not in the same room, facing an imminent threat of death or serious bodily injury.  See Response at 11.  James also points out that Carter admitted that he could not legally order a warrantless SWAT team entry and assault into the Murphy home unless the same exigent circumstances were present.  See Response at 11-12.  James also points to a variety of inconsistencies in the other officers' testimony regarding where M. Murphy was located as Carter fired the shot at Murphy Sr..  See Response at 12.[15]

The Tenth Circuit has previously dismissed substantive due-process claims brought by innocent bystanders killed during a police struggle with a suspect.  See Childress v. City of Arapaho, 210 F.3d at 1157 (citing Radecki v. Barela, 146 F.3d at 1232).  In the context of bystanders alleging

---

[15]As the Court discussed earlier, the most favorable view of the facts to James is that M. Murphy had walked outside of the room before Carter fired the shot.

a violation of their substantive due-process rights, the Tenth Circuit inquires "whether the officers 'acted with an intent to harm the participants or to worsen their legal plight.'" Childress v. City of Arapaho, 210 F.3d at 1158.  Gross negligence, recklessness, and even deliberate indifference to a person's plight does not qualify as a violation of a person's substantive due-process rights.  See Childress v. City of Arapaho, 210 F.3d at 1158.  Instead, a plaintiff must "present specific facts suggesting that the officers harbored an intent to harm them" to establish liability for a substantive due-process claim.  Childress v. City of Arapaho, 210 F.3d at 1158.

Here, as the Court has already discussed to some degree in the context of whether Carter seized M. Murphy, James has not pointed to any facts demonstrating that Carter acted with an intent to harm M. Murphy or worsen her legal plight.  In fact, James did not dispute the Defendants' material facts contained in their Motion for Summary Judgment to that effect.  Specifically, James did not dispute the following material facts.  Carter did not know nor should he have known that the shot he fired at Murphy Sr. would almost strike M. Murphy.  See MSJ ¶ 60, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  Carter did not restrain, arrest, imprison, or otherwise treat M. Murphy as if she was a suspect.  See MSJ ¶ 61, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  Carter did not fire his weapon with intent to harm M. Murphy "or worsen her legal plight."  MSJ ¶ 62, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  After Carter fired this first shot, he did not have any interaction with M. Murphy.  See MSJ ¶ 63, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).  Carter did not "intentionally seize[] or otherwise willfully acquire[] physical control over Mariah."  MSJ ¶ 64, at 11 (setting forth this fact); Response at 2-3 (not disputing this fact).

Given that James has not disputed these facts, there is no genuine issue of material fact whether a substantive due-process violation occurred with respect to M. Murphy.  James has not

-104-

"present[ed] specific facts suggesting that the officers harbored an intent to harm" M. Murphy as required to establish liability for a substantive due-process claim. Childress v. City of Arapaho, 210 F.3d at 1158. Even when viewing the facts in the light most favorable to James, James' decision not to dispute these facts undercuts any argument that Carter violated M. Murphy's substantive due-process rights, particularly given that Carter inflicted no harm on M. Murphy.

## IV.   THE COURT WILL ENTER SUMMARY JUDGMENT ON JAMES' EQUAL PROTECTION CLAIMS AGAINST ALL THE DEFENDANTS AS JAMES HAS AGREED TO THE COURT ENTERING JUDGMENT ON THOSE CLAIMS.

In her Amended Complaint, James asserted claims against the Defendants, including Carter, for violations of Murphy Sr.'s, M. Murphy's, and her Equal Protection Clause rights. See Amended Complaint ¶¶ 76-79, at 16-17. At the hearing, James agreed to voluntarily dismiss these claims. See Oct. 4, 2011 Tr. at 22:1-11, 33:25-34:4 (Robles, Court, Lyle). The Motion for Summary Judgment seeks dismissal of all the Equal Protection Clause claims against Carter and the other Defendants. See MSJ at 1, 23-25. Consequently, the Court will enter judgment on the Equal Protection Clause claims pursuant to James' agreement to dismissal of these claims.

**IT IS ORDERED** that the City Defendants' Motion for Partial Summary Judgment No. I: Dismissal of Plaintiff's Fourth and Fourteenth Amendment Excessive Force Claims Against Officer Carter and Fourteenth Amendment Equal Protection Claim, filed August 16, 2011 (Doc. 103), is granted. The Court will enter summary judgment on Plaintiff Theresa James' excessive force claims asserted under a Fourth Amendment theory as Defendant Russell Carter did not seize either Jay Murphy Sr. or Mariah Murphy within the meaning of the Fourth Amendment. Because James' unlawful entry claims are not in the Amended Complaint, and because James would have to move to amend to add these claims to the case, the Court will deny leave to amend. Granting leave to amend on the unlawful entry claims would be futile. Pursuant to the parties' agreement that the

Court can address these unlawful entry claims, the Court will enter summary judgment on James'

unlawful entry claims as exigent circumstances justified Carter's conduct in ordering the SWAT raid

and his conduct was reasonable.  The Court will enter summary judgment on James' excessive force

claims asserted under a substantive due-process theory because Carter's conduct does not shock the

conscience.  The Court will enter summary judgment on James' Equal Protection Clause claims

against Carter and the other Defendants as she have agreed to voluntary dismissal of those claims.


_____
UNITED STATES DISTRICT JUDGE


James P. Lyle
Law Offices of James P. Lyle P.C.
Albuquerque, New Mexico

    *Attorney for the Plaintiff*

Kathryn Levy
City of Albuquerque Legal Department
Albuquerque, New Mexico

    *Attorneys for Defendants Martin Chavez, III, Ray Schultz, and the City of Albuquerque*

Adam H. Greenwood
Douglas E. Gardner
Terri S. Beach
Luis E. Robles
Robles, Rael & Anaya
Albuquerque, New Mexico

    *Attorneys for Defendants Russell Carter, Michael Fox, and Josh Brown*